**Laura KELBER, Plaintiff,**

v.

**FOREST ELECTRIC CORP., et al., Defendants.**

**No. 90 Civ. 3790 (LJF).**

United States District Court, S.D. New York.

July 7, 1992.

Edward Griffith, Katten Muchin & Zavis, New York City, for plaintiff.

Gregory W. Homer, Andersen Kill Olich & Oshinsky, Washington, D.C., Chaim B. Book, Anderson Kill Olich & Oshinsky, New York City, for defendants.

## OPINION AND ORDER

FREEH, District Judge.

In this sex discrimination suit, defendants Forest Electric Corporation ("Forest Electric") and Forest Datacom Services ("Forest Datacom") move for summary judgment pursuant to Fed.R.Civ.P. 56(c). Plaintiff Laura Kelber ("Kelber") opposes the motion and argues that genuine issues of material fact preclude summary judgment. For the reasons stated below, defendants' motion is granted in part and denied in part. Because Kelber has presented no evidence suggesting that Forest Electric had any control over Forest Datacom's employment practices, all claims against Forest Electric are dismissed. Because Kelber has also failed to present any evidence supporting her disparate impact claim under Title VII, that claim must also be dismissed. However, material questions of fact remain in dispute with regard to Kelber's other Title VII claims. Accordingly, that claim will proceed to trial, along with Kelber's claim under the New York Human Rights Law. All other state law claims are dismissed.

FACTS

Kelber started working for Forest Datacom as a "journeyperson" electrician in November 1988.[1] (Defendants' 3(g) Statement ¶ A.2; Opposition at 7). Forest Datacom initially assigned her to work at the Merrill Lynch building in the World Financial Center in Manhattan. Construction of that building had been completed, so Kelber was working in an enclosed, heated environment while attaching wiring and cabling for computer equipment. (Opposition at 7).

In December 1988 or January 1989, Kelber learned that she was pregnant. (Defendants' 3(g) Statement ¶ B.6). Because her work at the Merrill Lynch building did not require heavy lifting or other strenuous activity, Kelber felt she could continue working at that site or at another similar job for the remainder of her pregnancy.[2] (Opposition at 7).

Kelber had missed work on numerous occasions while employed at the Merrill Lynch building. She did not report for work on January 16, 1989 because her son's day care was closed in observance of Martin Luther King's birthday. (Kelber Notes at 3). Kelber also missed work on February 2, 7, 21, and 22, 1989 because her son was sick. (Id. at 3–4).

In mid-February 1990, Kelber was transferred by Forest Datacom to the Citispire building at 56th Street in Manhattan which, like the Merrill Lynch building, was already fully constructed. Although her assignments at Citispire included pulling computer wires and climbing six-foot ladders, Kelber did not believe her nine-week pregnancy would be jeopardized by working at that location. (Kelber Notes at 3).

Kelber only worked at Citispire for approximately two weeks, however, because in late February she was transferred again,

to the Shearson American Express building on Greenwich and North Moore Street in Manhattan. The Shearson building was not completely constructed; on the contrary, the building was not even enclosed. At the outset of her assignment there, Kelber's supervisor warned her that she had too many absences, and that one more would result in her termination. (Kelber Notes at 7). Nevertheless, Kelber became sick and missed work on several more occasions. (Kelber Notes at 8–9) (referring to missing work on March 9, 20, and 21, 1990). On April 3, 1989, Kelber developed a 101 degree fever and telephoned her supervisor to report that she would be missing work again. Kelber's supervisor then told her that she was terminated due to excessive absences. (Kelber Notes at 10). Two days later, Kelber discovered that her baby had been dead for approximately four weeks. (Id.).

On June 4, 1990, Kelber filed this action alleging that Forest Datacom had (1) subjected her to unequal treatment because of her sex and her pregnancy, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2(c)(1), (2) and (d) [hereinafter "Title VII"] (Count 1); (2) implemented policies and procedures for assignment of work and termination of employees which have a disparate impact on pregnant women, in violation of Title VII (Count 2); (3) treated her in a manner which violated the New York Human Rights Law, N.Y.Exec. Law 296(1)(c) and (1–a)(c) (Count 3); (4) committed a prima facie tort by intentionally assigning her work which was inappropriate for a pregnant woman (Count 4); and (5) intentionally inflicted emotional distress on her by intentionally or recklessly assigning her to a job which was unsafe for a pregnant woman. (Count 5).[3] Defen-

---

1. Kelber is a member of Local 3 of the International Brotherhood of Electrical Workers ("Local 3"). After completing an apprenticeship program, she attained the level of a "journeyperson." (Opposition at 4).

2. Defendants do not dispute that they were made aware of Kelber's pregnancy almost immediately.

3. Kelber satisfied the statutory prerequisites for an action under Title VII by filing a Charge of Discrimination against Forest Datacom with the Equal Employment Opportunity Commission (the "EEOC") on July 18, 1989. (Complaint Ex. A). The EEOC issued a right to sue letter to Kelber on March 6, 1990 (Complaint Ex. B), and this action was filed shortly thereafter.

dants now move to dismiss all of Kelber's claims.

## DISCUSSION

### 1. *Forest Electric*

██ It is undisputed that Kelber worked for Forest Datacom, not Forest Electric. Thus, Forest Electric may only be held liable for the discriminatory acts alleged in Kelber's complaint if Kelber demonstrates that Forest Electric and Forest Datacom have an "integrated economic relationship" and exercise common control over each other's employment practices. *See Streeter v. Joint Industry Board*, 767 F.Supp. 520, 527 and n. 9 (S.D.N.Y.1991). Because Kelber has failed to demonstrate any such relationship between the two companies, all claims against Forest Electric are hereby dismissed.

██ Forest Electric is a wholly-owned subsidiary of JWP, Inc. ("JWP"). Forest Datacom is a division of Extel/JWPIS, Inc., another of JWP's wholly-owned subsidiaries. (Defendants' 3(g) Statement ¶¶ A.1, A.2). As a result, the two companies share a corporate parent, and certain high level management employees perform functions for both companies. (Rosenberg Dep., Plaintiff's Ex. 10 at 130–32). Forest Electric and Forest Datacom also share the same address, Seven Penn Plaza. (*Id.* at 15). However, field operations personnel for the two companies are separate (*Id.* at 130), and nothing in the record indicates that employees of Forest Electric exercise any control over Forest Datacom's employment practices. Under these circum-

stances, we do not find that Forest Electric and Forest Datacom comprise an integrated economic unit for purposes of Title VII.[4] *See Streeter*, 767 F.Supp. at 527 n. 9 (noting four factors relevant to determination of integrated enterprise: interrelationship of operations; common management, directors and boards; centralized control of labor relations and personnel; and common ownership and control).

### 2. *Title VII Claims*

The primary substantive provision of Title VII is § 703(a) of the Act, 42 U.S.C. § 2000e-2(a), which provides that it is an unlawful employment practice for an employer

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

In 1978, Title VII was amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which further provides that

[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited

---

**4.** Defendants mistakenly argue that Kelber's failure to name Forest Electric in her charge of discrimination to the EEOC provides a second reason for dismissal of her claims against that company. (Reply at 29 n. 15). As noted above, certain administrative prerequisites must be satisfied before a Title VII action can be filed in federal district court. *See Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1433 (D.C.Cir.1988) (outlining statutory requirements). For example, a potential plaintiff must first file a timely charge of discrimination with the EEOC, which in turn notifies the respondent named in the charge. *Id.* It is well-established, however, that an administrative charge against one defendant may provide sufficient notice to another defendant when the two

are closely related entities. *Streeter*, 767 F.Supp. at 524. While we do not find that Forest Electric and Forest Datacom are sufficiently interrelated to make Forest Electric responsible for Forest Datacom's employment practices, there is evidence in the record that the two companies shared a legal department. (Rosenberg Dep., Plaintiff's Ex. 10 at 130). Accordingly, if Forest Electric were liable for Forest Datacom's discriminatory conduct, Forest Electric would have received adequate notice of that potential liability at the same time as Forest Datacom. *Compare Berger*, 843 F.2d at 1434–35 (dismissing claims against one defendant because plaintiff did not comply with Title VII's administrative prerequisites).

to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work ...

 A plaintiff asserting a discrimination claim under Title VII can proceed under two different legal theories—disparate impact or disparate treatment. (Complaint Counts 1 and 2). A "disparate impact" claim "involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). By contrast, a disparate treatment claim involves allegations that an employer is treating "some people less favorably than others because of their race, color, religion, sex or national origin." *Id.* A disparate treatment claim requires proof of discriminatory motive, while a disparate impact claim does not. *Id.*

 As the Second Circuit recently noted, disparate treatment cases can also be divided into two categories—"pretext" cases or "mixed motive" cases. In a pretext case, a plaintiff asserts that the defendant's asserted rationale for plaintiff's termination was a mere "pretext" and "not the 'true reason' for the employment decision." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180–81 (2d Cir.1992). In a "mixed motive" case, a plaintiff alleges that the defendant had a number of reasons for terminating him or her and that "an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Id.* Although Kelber's complaint is not sufficiently detailed for us to determine whether she is pursuing a pretext claim or a mixed motive claim, or both, the factual allegations contained in that complaint

would support both claims. Accordingly, in determining defendants' motion for summary judgment, we will assume that Kelber seeks relief under both legal theories.[5]

### a. *Disparate Impact*

 As noted above, Title VII has been interpreted to forbid "not only overt discrimination but also practices that are fair in form but discriminatory in practice." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Under the Supreme Court's most recent case on the issue, a plaintiff asserting a disparate impact claim must demonstrate not only an imbalance in the work force, but also that "the disparity that they complain of is the result of one or more of the employment practices that they are attacking ..." *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989). At that point, the burden of production shifts to the employer to offer a business justification for his employment practices. *Id.* at 657–61, 109 S.Ct. at 2125–26.

The Civil Rights Act of 1991 (the "1991 Act") modified this latter aspect of the *Wards Cove* decision, and requires an employer to demonstrate that the challenged employment practice is not merely justified by business concerns, but was a matter of "business necessity." The 1991 Act amended 42 U.S.C. § 2000e–2 to add subsection (k)(1)(A), which provides that an unlawful employment practice based on disparate impact is established

> only if ... a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related and consistent with business necessity.

As discussed more fully below, courts are currently divided on the issue whether

**5.** In opposition to the motion for summary judgment, Kelber argues that her claims are sufficient whether this case is considered a pretext or a mixed motive claim. (Opposition at 32–42). However, in accordance with our December 1992 Order, 1992, we will only consider the first thirty-five pages of Kelber's brief because of her complete disregard of this Court's prior scheduling orders.

the 1991 Act is retroactive, in whole or in part.[6] We need not resolve that issue in the context of Kelber's disparate impact claim, however, because Kelber has not met her initial burden of demonstrating an employment practice which has a disparate impact on the basis of sex.

 In her complaint, Kelber alleges that Forest Datacom's job assignment and termination policies have a disparate impact on pregnant women. (Complaint ¶ 22). Kelber has failed to specify, however, any specific Forest Datacom employment practice affecting that group of employees. *See Wards Cove*, 490 U.S. at 657, 109 S.Ct. at 2125 (plaintiff must "demonstrate that the disparity they complain of is the result of one or more of the [challenged] employment practices ... specifically showing that each challenged practice has a significantly disparate impact on employment opportunities ...").

Even if Kelber had identified a particular discriminatory practice, her disparate impact claim must fail because she has not demonstrated that pregnant women, as a class, are adversely affected by Forest Datacom's policies. The only evidence supporting Kelber's claim is a study prepared by Jonathan Walker ("Walker"), a senior economist with Economists Incorporated. (Walker Aff. ¶ A). After reviewing Forest Datacom business records for the period from January 1, 1988 through December 31, 1989, Walker concluded that there were disparities in the "employment patterns" of Forest Datacom's male and female electricians during that period. (Walker Aff. ¶ H). Walker further concluded, however, that the "observed disparities were not statistically significant," as a result of the small sample size. (Walker Aff. ¶ I) (noting that Forest Datacom only employed a small number of female electricians). As a result, Walker's study does not support Kelber's claim that Forest Datacom's policies had a disparate impact on women in general, or pregnant women specifically.[7] Absent such evidence, Forest Datacom is entitled to judgment as a matter of law. Count 2 of the Complaint is dismissed.

### b. *Disparate Treatment*
#### (1) *Pretext Claim*

 The Supreme Court has established a three-step inquiry for disparate treatment claims under Title VII. First, the plaintiff must establish a *prima facie*

---

**6.** Although the Second Circuit recently had an opportunity to address the retroactivity issue, it declined to do so on the grounds that the question had not been properly briefed and argued. *See Song v. Ives Laboratories, Inc.*, 957 F.2d 1041 (2d Cir.1992). One judge in this Court has held that the 1991 Act does not apply to cases which have already been tried, but did not discuss whether it applies to Title VII cases which are in the pretrial stage. *Sorlucco v. New York City Police Dept.*, 780 F.Supp. 202, 213 (S.D.N.Y.1992) (Mukasey, J.). Another judge recently held that the Act should be applied retroactively. *See Jackson v. Bankers Trust Co.*, 1992 WL 111105 (S.D.N.Y.1992) (Martin, J.). The only two Circuit Courts to address the issue have held that the 1991 Act does not apply to pending cases. *See Fray v. Omaha World Herald Company*, 960 F.2d 1370 (8th Cir.1992) (finding that the Act is not retroactive); *Vogel v. City of Cincinnati*, 959 F.2d 594 (6th Cir.1992) (1991 Act does not apply retroactively to claims for damages). District courts around the country have reached differing conclusions on the issue. *Compare Croce v. V.I.P. Real Estate, Inc.*, 786 F.Supp. 1141 (E.D.N.Y.1992) (1991 Act applies retroactively); *Graham v. Bodine Electric Co.*, 782 F.Supp. 74 (N.D.Ill.1992) (same); *Saltarikos v. Charter Mfg. Co.*, 782 F.Supp. 420 (E.D.Wis.1992) (same);

*Stender v. Lucky Stores*, 780 F.Supp. 1302 (N.D.Cal.1992) (finding 1991 Act is retroactive); *Mojica v. Gannet Co.*, 779 F.Supp. 94 (N.D.Ill. 1991) (same); *King v. Shelby Medical Center*, 779 F.Supp. 157 (N.D.Ala.1991) (same) *with Smith v. Petra Cablevision Corp.*, CV–88–2091, 793 F.Supp. 417 (E.D.N.Y.1992) (1991 Act not retroactive); *McLaughlin v. State of New York*, 784 F.Supp. 961 (N.D.N.Y.1992) (mistakenly designated S.D.N.Y.; concluding 1991 Act is not retroactive); *Khandelwal v. Compuadd Corp.*, 780 F.Supp. 1077 (E.D.Va.1992) (same); *High v. Broadway Industries*, 1992 WL 33860 (W.D.Mo., January 7, 1992) (same); *Van Meter v. Barr*, 778 F.Supp. 83 (D.D.C.1991) (same); *Hansel v. Public Service Co.*, 778 F.Supp. 1126 (D.Colo.1991) (same).

**7.** When Walker combined Forest Datacom's employment records with those from Forest Electric, he did discover statistically significant disparities in employment patterns between male and female electricians employed by the two companies. (Walker Aff. ¶¶ K–M). However, given our conclusion that Forest Electric is not a proper defendant here, Forest Electric's policies cannot be used as evidence against Forest Datacom.

case of discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 250, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). While the burden of establishing a *prima facie* case "is not onerous," Kelber must, at minimum, demonstrate that she was discharged from a position for which she was qualified "under circumstances which give rise to an inference of unlawful discrimination." *Id.* at 253, 101 S.Ct. at 1094. *See also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (*prima facie* case of racial discrimination established by showing that plaintiff was (1) a member of a protected class; (2) qualified for the position from which he or she was discharged; (3) discharged; and (4) that after plaintiff's discharge, "the position remained open and the employer continued to seek applicants from persons of complainant's qualifications").

 If Kelber establishes a *prima facie* case of discrimination on the basis of sex, the burden of production then shifts to Forest Datacom, to articulate a legitimate, nondiscriminatory reason for its actions.[8] If Forest Datacom does so, the burden shifts again, and Kelber must demonstrate that the employer's stated reasons for its employment practices "were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

8. Under this analysis, the evidentiary burden of "production" shifts to defendant. However, it must be emphasized that the burden of persuading the trier of fact that defendant intentionally discriminated always remains with the plaintiff. *Burdine,* 450 U.S. at 251, 101 S.Ct. at 1093.

9. In support of her claim that Forest Datacom had a discriminatory motive, Kelber also argues that the company transferred her to the Shearson building in order to satisfy governmental affirmative action requirements that applied to that job site. (Opposition at 17). Contrary to Kelber's claims, however, the fact that Forest Datacom may have transferred her in order to comply with state-imposed affirmative action requirements does not necessarily mean that Forest Datacom intended to discriminate against its female electricians. Rather, Forest Datacom's conduct could also suggest that Forest Datacom was attempting *not* to discriminate

 Forest Datacom correctly notes that summary judgment may be appropriate in an employment discrimination case if no issues of material fact remain in dispute with regard to Kelber's *prima facie* case, or Forest Datacom's explanation for its actions. (Motion at 31; Reply at 2–3). However, because intent and state of mind are frequently disputed in discrimination cases, courts approach summary judgment motions in that context with caution. *See Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).

 Kelber claims that her transfer to the Shearson building and her termination were the result of Forest Datacom's intentional discrimination against female electricians generally, and pregnant electricians specifically. According to Kelber, the mere fact that Forest Datacom transferred a pregnant employee from a heated, indoor job site to an outdoor job site in the middle of the winter suggests that Forest Datacom "may not have wanted a pregnant electrician on the payroll and decided to transfer her to the Shearson job site knowing that she could not last there."[9] (Opposition at 17). In response, Forest Datacom argues that it treated Kelber the same as the male electricians and that it was not required to treat her differently merely because she was pregnant. (Motion at 28). Forest Datacom further argues that it had a legitimate business justification for Kelber's transfer based on the work needs at the various job sites.[10] (Reply at 18–19).

and to treat its male and female employees the same. While the political pressure on Forest Datacom to assign women to the Shearson building is certainly relevant here, the existence of such pressure suggests only that the company may have had mixed motives for transferring Kelber, some of which may have been legitimate.

10. Forest Datacom concedes that certain electricians were transferred from the Shearson building to Citispire, but argues that that transfer occurred prior to Kelber's assignment to the Shearson building, and was based on the particular needs of the Citispire project at that time. (Opposition at 16; Reply at 18). Forest Datacom also asserts that a male electrician who had previously been sent from the Shearson building to Citispire was sent back to the Shearson building when the work requirements at Citispire were reduced. (Reply at 19).

Finally, Forest Datacom claims that it was justified in terminating Kelber because of her excessive absences from work. (Motion at 33).

Despite Forest Datacom's attempts to frame this case as one involving purely legal issues, issues of material fact with regard to the company's intent in transferring and then terminating Kelber preclude summary judgment here. It is undisputed that Kelber had a substantial number of absences prior to her transfer to the Shearson building and she was warned by her supervisor that she could not have any more absences. (Kelber Notes at 3–4, 7). It is also undisputed that Kelber collected a number of additional absences while working at the Shearson building. (Kelber Notes at 8–10). However, a trier of fact could find that Forest Datacom deliberately assigned Kelber to a building in which she was likely to become ill and miss work again, thus providing the company with an excuse to fire her.

 Forest Datacom claims that it was precluded from offering Kelber "special treatment" merely because she was pregnant. In making that argument, Forest Datacom misreads the Supreme Court's decision in *International Union, UAW v. Johnson Controls, Inc.*, —— U.S. ——, ——, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991). The issue in that case was an employer's policy regarding women who could potentially become pregnant, not those who were pregnant. Nevertheless, the Supreme Court held that Johnson Controls' "fetal protection policy" violated the Pregnancy Discrimination Act ("PDA"). —— U.S. at ——–——, 111 S.Ct. at 1209–10. In reaching that conclusion, the Court relied on the PDA's language stating that unless pregnant employees differ from others "in their ability or inability to work," they must be treated the same as other employees. —— U.S. at ——, 111 S.Ct. at 1206. While the Court concluded that "women as capable of doing their jobs as their male counterparts may not be forced

between having a child and having a job," it did not suggest that employers could not offer less onerous jobs to pregnant women who were *incapable* of performing certain tasks. —— U.S. at ——, 111 S.Ct. at 1206 ("the safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job"). Contrary to Forest Datacom's claims, nothing in *Johnson Controls* justifies an employer deliberately giving a pregnant employee an assignment which she cannot and should not perform simply because the employer wants to treat her "the same as" male or non-pregnant female employees. Such a failure to accommodate a pregnant employee's physical limitations might indicate an intent to discriminate against that employee based on her pregnancy. *See* 29 C.F.R. § 1604, Appendix at 204–05 ("An employer is required to treat an employee temporarily unable to perform the functions of her job because of her pregnancy-related condition in the same manner as it treats other temporarily disabled employees, whether by providing modified tasks, alternative assignments, disability leaves, leaves without pay, etc.").

 Summary judgment is also inappropriate here because Kelber has raised a factual issue with regard to an unofficial policy of Forest Datacom's foremen to "cover" for electricians who were absent from work, which they did not provide to her. Allegedly, Forest Datacom's foremen would indicate on time sheets that an absent electrician had in fact been on the job in order that the absent electrician would still get paid. (Opposition at 21–24). Forest Datacom denies any such practices and argues that even if its foremen did "cover" for certain employees, those practices were contrary to official company policy. (Motion at 32). However, Kelber has presented some evidence that the company's foremen offered such protection to certain electricians and that they refrained from "covering" for her for discriminatory reasons.[11]

---

11. Kelber has raised at least one possible motivation for the alleged discriminatory conduct. According to Kelber, she had a conflict with the foreman at the Shearson building at the beginning of her assignment there. On her first day on the job, a sub-foreman asked her to get everyone coffee, a job usually given to apprentices, not journeyperson electricians such as

Under these circumstances, the trier of fact must determine whether Forest Datacom employees implemented a policy of "covering" for one another, and whether those employees denied Kelber the benefit of that policy for discriminatory reasons.

### (2) Mixed Motive Claim

In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court addressed the question whether a violation of Title VII occurs when an employer considers—but does not necessarily rely on—an employee's race, gender, national origin, or religion in making an employment decision. Under the various opinions in *Price Waterhouse*, a plaintiff in such a "mixed motive" case must show more than the "not onerous" *McDonnell Douglas–Burdine* factors to establish a *prima facie* case of discrimination. As the Second Circuit has recently noted, *Price Waterhouse* requires a "mixed motive" plaintiff to show "that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." *Tyler*, 958 F.2d at 1181. At that point, "the employee has proved that the decision was made at least in part 'because of' the illegitimate factor ... [and] is entitled to succeed subject only to the employer's opportunity to prove its 'affirmative defense;' that is, 'that it would have reached the same decision as to [the employee's employment] even in the absence of the' impermissible factor." *Id.* at 1181 (citations omitted).

 The 1991 Act modified the standards announced in *Price Waterhouse*. The Act essentially eliminated the affirmative defense cited above, providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 1991 Act, Section 107(a), to be codified at 42 U.S.C. § 2000e–2(m). Given our conclu-

sion that the trier of fact must determine Forest Datacom's intent in transferring and then terminating Kelber, we could wait until trial to determine whether the 1991 Act or *Price Waterhouse* applies here. But discovery has been completed, and this case is essentially trial-ready. Moreover, Kelber seeks to recover compensatory and punitive damages and has demanded a jury trial on all issues. *See* 1991 Act, Section 102 (allowing such damages under certain circumstances and permitting a jury trial in cases in which damages are sought). As a result, it is appropriate for us to decide the retroactivity issue at this time.

 The Court concludes that neither the Act nor its legislative history clearly reflect Congress's intent with regard to the Act's retroactivity. Accordingly, we must evaluate Supreme Court and Second Circuit case law governing that issue. However, neither the Supreme Court nor the Second Circuit have established firm rules in this area. Thus, we must determine whether to follow the "presumption of retroactivity" established by the Supreme Court in *Bradley v. School Board of City of Richmond*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), or the Supreme Court's more recent statements contradicting the *Bradley* rule. *See Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) (retroactivity disfavored in the law). Because the Supreme Court and the Second Circuit appear to be moving away from the holding in *Bradley*—a holding which has been subject to substantial criticism—we find that the 1991 Act does not apply to pending cases.

 It is well-established that if congressional intent regarding retroactivity is clear, that intent governs. *See Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 837, 110 S.Ct. 1570, 1577, 108 L.Ed.2d 842 (1990). Thus, as an initial matter, we must examine the plain language of the 1991 Act, as well as its legislative histo-

---

Kelber. (Kelber Notes at 5). While Kelber agreed to get the coffee on her first day, she refused to do so when asked again on her second day. (*Id.* at 5–6). While the foreman on

the job overruled the sub-foreman and had an apprentice get the coffee, Kelber claims she was concerned she had "labelled [herself] a troublemaker" with the foreman. (*Id.* at 6).

ry, to determine whether Congress intended that Act, or any portion of it, to be applied to pending cases. *McLaughlin*, 784 F.Supp. at 967–68.

### a. The 1991 Act

The 1991 Act was enacted after a protracted legislative battle over the course of two years. *See Fray*, 960 F.2d at 1375 (noting that Congress' 1990 civil rights bill had been vetoed by President Bush). The Act was intended, at least in part, to "provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace ... [and] ... to respond to recent decisions of the Supreme Court by expanding the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." 1991 Act, Section 3.

The text of the Act does not specifically state whether it is to be applied retroactively. The only provision regarding the statute's effective date is Section 402(a), which merely states that "[e]xcept as otherwise provided, this Act and the amendments made by this Act shall take effect upon enactment." Because that language is ambiguous with regard to retroactivity, most courts have not relied on that provision to determine the issue. *See McLaughlin*, 784 F.Supp. at 968.

■ While no other provision directly addresses the Act's effective date, two sections of the statute do include statements that those particular provisions are not to be applied retroactively.[12] Some courts have relied on this language to infer that Congress intended the rest of the Act be applied to pending cases. *See Stender*, 780 F.Supp. at 1304 (N.D.Cal.1992) (if Act were to apply prospectively only, retroactivity language of these two sections would be "meaningless"); *Graham*, 782 F.Supp. at 76 (N.D.Ill.1992) ("The Court is unwilling to emasculate these provisions by making them redundant."). In our view, however, Congress's silence on the retroactivity issue suggests that Congress did not resolve the issue. *See McLaughlin*, 784 F.Supp. at 968 (noting that, in other contexts, Congress has been explicit with regard to the retroactive/prospective effect of new legislation); *Maddox v. Norwood Clinic, Inc.*, 783 F.Supp. 582, 585 (N.D.Ala.1992) ("When Congress wants a statute to apply retroactively, it is quite capable of saying so in plain, unequivocal language."). As a result, we must look to the Act's legislative history to try to discern Congress's intent regarding retroactivity.[13]

### b. Legislative History

Congress initially tried to enact civil rights legislation in 1990, but did not succeed because President Bush vetoed the proposed bill, in part because of its "unfair retroactivity rules." *See Fray*, 960 F.2d at 1375. When Congress resumed its efforts to draft such a bill in 1991, it omitted any direct reference to retroactivity. The President signed that bill, which is now known as the Civil Rights Act of 1991. The Eighth Circuit has relied on this series of events to find a congressional intent to have the statute applied prospectively only. *Id.* at 1378 ("When a bill mandating retroactivity fails to pass, and a law omitting that mandate is then enacted, the legislative intent was surely that the new law be prospective only; any other conclusion simply ignores the realities of the legislative process.").

---

**12.** Section 109, which extends Title VII to United States citizens working outside the country expressly states that it "shall not apply with respect to conduct occurring before the date of the enactment of this Act." Similarly, Section 402(b) states that the amendments with regard to disparate impact cases shall not apply "to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983."

**13.** The EEOC has issued a Policy Guideline Directive stating that the compensatory and punitive damages provisions of the 1991 Act should not be applied retroactively. While that interpretation is entitled to some deference, it is not binding on this Court. *See General Electric v. Gilbert*, 429 U.S. 125, 139–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976); *E.E.O.C. v. Arabian American Oil Co.*, — U.S. —, —, 111 S.Ct. 1227, 1235, 113 L.Ed.2d 274 (1991) (declining to defer to EEOC construction of Title VII). *See also Croce*, 786 F.Supp. at 1150 (declining to follow Policy Guideline Directive).

However, most courts addressing this issue have acknowledged that the legislative "history" for the 1991 Act is, at best, unclear,[14] and that the mere omission of a retroactivity provision in the face of a presidential veto does not necessarily indicate that Congress intended to have the statute applied prospectively.[15] To the contrary, if Congress's omission of language regarding retroactivity is "dispositive" of anything, "it is dispositive merely of Congress's intent to leave the retroactivity decision to the courts." *Fray,* 960 F.2d at 1379 (Heaney, J., dissenting). The fact that the 1990 civil rights bill, which contained a retroactivity provision, passed both houses of Congress indicates that a majority of Congress favored retroactivity. *Id.* However, President Bush vetoed that bill, in part because of its explicit statement regarding retroactivity. *Id.* at 1375 (citing 136 Cong.Rec. S.16562, daily ed. October 24, 1990). Congress was thus aware that the President was not likely to sign any civil rights legislation which contained an express retroactivity provision. Congress then passed a bill which left the issue ambiguous and which, given the unsettled state of the case law, allowed both supporters and nonsupporters of retroactivity to assert that their views had prevailed. *Id.* at 1380 (Heaney, J., dissenting) ("Congress ... deliberately left the Act retroactivity-neutral, reserving the issue for the courts to decide. Taking

advantage of the different rules in *Bradley* and *Georgetown Hospital,* both sides claimed victory."). Under these circumstances, we cannot conclude that Congress's actions indicate anything more than an intent to avoid resolving the retroactivity issue.[16] *See McLaughlin,* 784 F.Supp. at 969 (N.D.N.Y.1992) ("[T]he legislative history [of the Act] shows that Congress was purposefully ambiguous on the issue of ... retroactivity, thus intending to leave the issue for the judiciary to resolve."). Accordingly, we must analyze Supreme Court and Second Circuit authority on retroactivity.

#### c. *Case Law Regarding Retroactivity*

██ As noted above, the Supreme Court has issued two conflicting lines of opinions regarding the retroactivity of federal statutes. In *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268, 281–84, 89 S.Ct. 518, 526–27, 21 L.Ed.2d 474 (1969), and again in *Bradley,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Court held that a court must "apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." 416 U.S. at 711, 94 S.Ct. at 2016. At the same time, the Court has acknowledged another "venerable" rule of statuto-

---

**14.** The unreliability of the Act's legislative history is evidenced by the fact that a number of courts have relied on that history to find that the Act either is or is not retroactive. *Compare Stender,* 780 F.Supp. at 1304 (legislative history "does not contradict the fact that the plain language of the Act supports its retroactive application") *with Maddox,* 783 F.Supp. at 585 (legislative history "suggests a collective intent ... to have the final Act apply only prospectively"). As the United States District Court for the Northern District of New York recently noted, "[i]t is difficult to fathom how this court can find that Congressional intent concerning retroactivity is clear when [other] respected courts have reached such opposite but plausible conclusions on the issue." *McLaughlin,* 784 F.Supp. at 968.

**15.** *See Vogel,* 959 F.2d at 598 (legislative history provides no guidance in interpreting Act); *Croce,* 786 F.Supp. at 1144 (E.D.N.Y.1992) (*quoting King,* 779 F.Supp. at 157) ("Many senators and congressmen have deliberately tried to cre-

ate a 'legislative history' to support their personal views on this question (and) deliberately chose not to include in the statute itself a provision either for retroactive or for prospective-only application."); *Van Meter,* 778 F.Supp. at 84 ("[T]he legislative history of the 1991 Act not only fails to provide any guidance on the question [of retroactivity], ... it affirmatively leaves the issue in total confusion.").

**16.** Some might argue that this interpretation of the Act's legislative history effectively nullifies the President's veto, which had the desired effect of forcing Congress to eliminate the Act's retroactivity provisions. However, if he had wanted a final resolution of the retroactivity issue, the President could have vetoed any civil rights legislation which did not contain an express statement requiring the Act to be applied prospectively. The President's acceptance of a bill which left the issue unresolved suggests that, like Congress, he was willing to have the courts determine whether the Act is retroactive.

ry interpretation, "that statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985). *See also Georgetown University Hospital*, 488 U.S. at 208, 109 S.Ct. at 471 ("[C]ongressional enactments ... will not be construed to have retroactive effect unless their language requires this result."). Justice Scalia has urged the Court to resolve this conflict, and has indicated that he would expressly overrule *Thorpe* and *Bradley*. *See Kaiser*, 494 U.S. at 841, 110 S.Ct. at 1579 (Scalia, J., concurring). Thus far, the Court has declined the invitation to reconcile the two lines of precedent. *See Kaiser*, 494 U.S. at 837, 110 S.Ct. at 1577 ("We need not in this case ... reconcile the two lines of precedent ... because under either view, where the congressional intent is clear, it governs.").

As noted previously, the Second Circuit has not yet addressed the *Bradley/Georgetown University* conflict, or the retroactivity of the 1991 Act, and it is difficult to discern how the Court would rule on that issue.[17] The Court has cited to *Georgetown University* only once, in a case involving the retroactive application of an agency ruling. *Lehman v. Burnley*, 866 F.2d 33, 37 (2d Cir.1989). In *Lehman*, the

Court did, however, emphasize that "[r]etroactivity is not favored in the law ..." *Id.*

On the other hand, the Second Circuit has expressly approved of and followed the *Bradley* rule on numerous occasions. For example, in *Brown v. General Services Administration*, 507 F.2d 1300 (2d Cir. 1974), *aff'd*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), the Second Circuit held that § 717(c) of the Equal Employment Opportunity Act of 1972, which added a private right of action for federal employees under Title VII, applied to pending cases. In so ruling, the Court "rejected the argument that when a statute does not specifically provide for retroactive application, the statute should be applied only prospectively," *Von Allmen v. State of Connecticut Retirement Bd.*, 613 F.2d 356, 360 (2d Cir. 1979), and held that *Bradley* was controlling.[18] 507 F.2d at 1305–06. In fact, the Second Circuit cited to *Bradley* quite recently, although the Court concluded that the statute at issue precluded retroactive application. *See United States v. Colon*, 961 F.2d 41, 44–45 (2d Cir.1992). *See also Leake v. Long Island Jewish Medical Center*, 869 F.2d 130 (2d Cir.1989) (affirming district court's finding that Civil Rights Restoration Act of 1987 applied retroactive-

---

**17.** District courts within the circuit have disagreed as to how the Court would rule on the retroactivity issue. *See Croce*, 786 F.Supp. at 10 (*Bradley* continues to be controlling rule); *Smith*, 793 F.Supp. 417, 430 n. 13 (disagreeing with *Croce* and noting that Second Circuit had, at least once, relied on *Bowen*). *See also McLaughlin*, 784 F.Supp. at 971 (refusing to "adopt *Bradley* simply by default").

**18.** The Second Circuit has relied on or cited the *Bradley* rule in many other cases. *See Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 723 (2d Cir.1990) ("A federal court generally will apply the law in effect at the time it renders its decision.") (citing *Bradley*); *Taub, Hummel & Schnall v. Atlantic Container Line*, 894 F.2d 526, 529 (2d Cir.1990) (noting that appellants had quoted "the general rule" that "a new statute applies to cases pending on the date of its enactment"); *Leake v. Long Island Jewish Medical Center*, 869 F.2d 130 (2d Cir.1989) (affirming district court's application of *Bradley* rule); *Counsel v. Dow*, 849 F.2d 731, 736 n. 4 (2d Cir.1988) (citing *Bradley*), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d

380 (1988); *O'Hare v. General Marine Trans. Corp.*, 740 F.2d 160 (2d Cir.1984) (same); *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987) ("Since Chief Justice Marshall's opinion in *U.S. v. The Schooner Peggy*, it has been the duty of courts to decide the issues in a case consistent with the directives of a statute enacted subsequent to the judgment appealed from. That is, a court is required to apply the law in effect when it renders a decision, absent a congressional directive to the contrary."); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 n. 2 (2d Cir.1985) (agreeing with district court's conclusion that *Bradley* governed case); *Sierra Club v. United States Army Corps. of Engineers*, 732 F.2d 253, 258 (2d Cir.1984) (citing *Bradley* rule); *N.L.R.B. v. Koenig Iron Works, Inc.*, 681 F.2d 130, 147 (2d Cir.1982) (citing *Bradley* with approval, but finding it does not apply to facts of case); *Von Allmen*, 613 F.2d at 360 (citing *Bradley* and *Brown*); *Torres v. Sachs*, 538 F.2d 10, 13 (2d Cir.1976) (Voting Rights Act "concededly applicable to cases pending at the time of its enactment," citing *Bradley*).

ly in absence of any indication of congressional intent).[19]

Even when following *Bradley*, however, the Second Circuit has suggested that the presumption of retroactivity applies only to cases before an appellate court on direct review. *See Colon*, 961 F.2d at 44–45 (referring to cases "on direct review"); *Hegger v. Green*, 646 F.2d 22, 26 (2d Cir.1981) (citing *Bradley* for "well settled" rule that "on direct review an appellate court must apply the law in effect at the time it renders its decision"). This is consistent with Justice Scalia's persuasive argument that *Bradley* misstated the presumption of retroactivity originally set out in *Thorpe*, and expanded that principle to all cases pending at the time of a statutory amendment, rather than limiting it to cases in which the amendment occurs between the entry of judgment and decision on appeal. *See Kaiser*, 494 U.S. at 848, 110 S.Ct. at 1583 (noting difference between two formulations of rule). While the Second Circuit has also used extremely broad language in approving *Bradley*,[20] the Court's willingness to cite the contrary rule in *Lehman* suggests that it too perceives the Supreme Court to be moving away from *Bradley*. Accordingly, we do not consider ourselves bound by that case or the presumption of retroactivity. Consistent with the general rule followed for decades prior to *Bradley* and the Supreme Court's most recent statements on the issue, we hold that where, as here, Congress has not clearly expressed an intention that a statute apply to pending cases, that statute shall have prospective effect only. The 1991 Act does not apply to Kelber's claims.

### 3. State Law Claims

Forest Datacom also moves for summary judgment on Kelber's state law claims. More specifically, Forest Datacom claims that (1) Kelber's claims for intentional infliction of emotional distress and prima facie tort must be dismissed because they are time-barred, or are preempted under § 301 of the Labor Management Relations Act and Workers Compensation statute, and because Kelber has failed to state a claim; and (2) Kelber's claim under the New York Human Rights Law is barred because she previously elected to pursue an administrative remedy before the New York Division of Human Rights. Because the Court concludes that Kelber's claims for intentional infliction of emotional distress and prima facie tort are barred by the statute of limitations, those claims are dismissed, and we need not address Forest Datacom's other arguments with regard to those claims. However, Kelber's claim under the New York Human Rights Law may proceed to trial.

### a. Intentional Infliction of Emotional Distress/Prima Facie Tort

■ Kelber's employment was terminated on April 3, 1989. (Kelber Notes at 10). This action was filed approximately fourteen months later, on June 4, 1990. Under current New York law, a one-year statute of limitations applies to claims for intentional infliction of emotional distress.[21]

---

**19.** *Leake* involved a "restorative" statute, which was intended to "restore the broad scope of coverage and to clarify the application of" the Rehabilitation Act, which had been limited by the Supreme Court. *See Leake v. Long Island Jewish Medical Center*, 695 F.Supp. 1414, 1415 (E.D.N.Y.1988) (quoting the 1987 Act). The Second Circuit has been particularly willing to accept retroactive application of federal statutes which are designed to "codify a congressional purpose long in place which Congress believes the Supreme Court has misinterpreted." *Mrs. W. v. Tirozzi*, 832 F.2d 748, 755 (2d Cir.1987). Nevertheless, the Second Circuit did affirm the district court's opinion in *Leake*, which distinguished *Bennett*, and which cited the *Bradley* rule. *See Leake*, 695 F.Supp. at 1416–17.

**20.** *See Gonzalez*, 909 F.2d at 723 ("A federal court generally will apply the law in effect at the time it renders its decision."); *Taub, Hummel & Schnall*, 894 F.2d at 529 (noting that appellants had quoted "the general rule" that "a new statute applies to cases pending on the date of its enactment").

**21.** CPLR § 215(3) provides that specified intentional torts are subject to a one-year statute of limitations. Although intentional infliction of emotional distress is not one of the claims listed in the statute, New York courts have held that § 215(3) applies to that cause of action as well.

*See Grant v. Pfizer*, 683 F.Supp. 41 (S.D.N.Y.1988); *Misek–Falkoff v. International Business Machines Corp.*, 162 A.D.2d 211, 556 N.Y.S.2d 331 (1st Dept.), *appeal denied*, 76 N.Y.2d 708, 560 N.Y.S.2d 990, 561 N.E.2d 890 (1990). Because Kelber did not file her complaint within that one-year period, her claim for intentional infliction of emotional distress is time-barred and must be dismissed.

 Kelber's claim for a prima facie tort must also be dismissed. In New York, a plaintiff may proceed under a prima facie tort theory, even if the facts of the case would also support another, traditional theory of relief. *See L/M Ninety CM Corp. v. 2431 Broadway Realty Co.*, 170 A.D.2d 373, 566 N.Y.S.2d 277, 278 (1st Dept.1991) ("The fact that some of the acts alleged may also constitute traditional tort causes of action does not require the dismissal of the prima facie tort claim."). However, a plaintiff cannot use the prima facie tort, which has a three-year limitations period, to avoid the shorter statute of limitations applicable to other intentional torts. *See Jones v. City of New York*, 161 A.D.2d 518, 555 N.Y.S.2d 788, 789 (1st Dept.1990) (because "complete relief" was available under traditional tort theories of intentional infliction of emotional distress and wrongful eviction, dismissal of those claims on statute of limitations grounds requires dismissal of prima facie tort claim as well). Because Kelber failed to comply with the one-year statute of limitations applicable to her claim for intentional infliction of emotional distress—a claim which would likewise provide her with "complete relief"—

her prima facie tort claim must also be dismissed.

### b. *New York Human Rights Law*

 Forest Datacom also moves to dismiss Kelber's claim under the New York Human Rights Law, on the grounds that Kelber has "elected" an administrative remedy rather than legal relief. Executive Law § 297(9) provides that if a party alleging sex discrimination files a complaint with the New York Division of Human Rights, that party is precluded from filing a discrimination complaint in a New York state court. *See* Executive Law § 297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction ... unless such person had filed a complaint hereunder or with any local commission on human rights ..."). Kelber did not file an administrative complaint at the state level. However, as required by Title VII, she did file a charge of discrimination with the EEOC, which complaint is automatically referred by the EEOC to the New York Division of Human Rights. *See Dapelo v. Banco Nacional de Mexico*, 767 F.Supp. 49, 52 (S.D.N.Y.1991). The New York state courts have determined that a referral by the EEOC to a state agency constitutes an "election of remedies" under Executive Law § 297(9) and thus, also precludes state courts from exercising jurisdiction over discrimination claims.[22] *Scott v. Carter–Wallace, Inc.*, 147 A.D.2d 33, 541 N.Y.S.2d 780, 783 (1st Dept.), *app. dismissed*, 75 N.Y.2d 764, 551 N.Y.S.2d 903, 551 N.E.2d 104 (1989).[23]

---

**22.** As noted in our earlier ruling on this issue in *Harrow v. Lorillard Tobacco*, 1991 WL 267766 (S.D.N.Y.1991), the *Carter–Wallace* decision was effectively overruled by the New York State Legislature this past July, when it amended § 297 of the Executive Law to state that "[a] complaint filed by the equal employment opportunity commission ... shall not constitute the filing of a complaint within the meaning of this subdivision." *See Wiesman v. Metropolitan Museum of Art*, 772 F.Supp. 817, 818 (S.D.N.Y. 1991). This Court has found that that amendment does not apply to cases filed after July 15, 1991, however, because the statute specifically states that it shall only apply to complaints "filed ... on or after" the amendment's effective date. *Harrow*, 1991 WL 267766 at 2, n. 2. A

New York state court has recently found that, despite this clear language to the contrary, the amendment to § 297 must be applied retroactively. *See Ito v. Harris*, 206 N.Y.L.J., October 25, 1991 at 22, col. 4 (Sup.Ct. New York Cty. 1991). Given our finding that Kelber's dismissal of her administrative claim is sufficient to allow us to hear her claim under the Human Rights Law, we need not address this issue.

**23.** The court in *Carter–Wallace* specifically declined to determine the effect of its ruling on federal courts' jurisdiction over pendent state law claims. 541 N.Y.S.2d at 783 ("[W]hat effect this ruling might have on a federal court's decision to exercise pendent jurisdiction over a Hu-

We have held, consistent with the Second Circuit's ruling in *Promisel v. First American Artificial Flowers*, 943 F.2d 251, 256–58 (2d Cir.1991), that a federal court may exercise pendent jurisdiction over discrimination claims under the Human Rights Law if the administrative complaint is dismissed, even if the dismissal is at the request of the plaintiff. *Harrow*, 1991 WL 267766 at 2. *See also Promisel*, 943 F.2d at 257–58 ("Even at the request of the plaintiff, the administrative dismissals do not circumvent the operation of the election of remedies provision ... We see no need to read in a restriction upon a plaintiff's ability to have such suits dismissed in order to bring state claims in an ongoing federal proceeding ..."). Forest Datacom attempts to distinguish this case, however, claiming that Kelber merely "withdrew" her administrative complaint and that the New York Division of Human Rights did not dismiss the claim for administrative convenience. (Reply at 25). It is true that the "closing statement" used by the Division indicates that the claim was "[w]ithdrawn by Complainant," not that it was dismissed for administrative convenience. (Defendants' 3(g) Statement Ex. O). However, that statement is a one-page form which does not allow for much detail regarding each case. Nothing in the record indicates that a case designated "withdrawn by complainant" is not or could not also be considered a dismissal for administrative convenience. Moreover, in *Promisel* the Second Circuit assumed that a charge dismissed at the request of the plaintiff constitutes a administrative dismissal. 943 F.2d at 257. Under these circumstances, we do not find this case distinguishable from *Promisel*. Kelber may proceed to trial on her Human Rights Law claim.

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. All claims against Forest Electric are dismissed, as

are Kelber's disparate impact claims under Title VII and her claims for intentional infliction of emotional distress and prima facie tort. However, material questions of fact remain in dispute with regard to Kelber's other Title VII claims. Accordingly, that claim will proceed to trial, along with Kelber's claim under the New York Human Rights Law.

SO ORDERED.

man Rights Law claim we cannot say."). On the other hand, the court did suggest that a plaintiff's entire discrimination claim should proceed in federal court, once the plaintiff has declined to pursue his or her administrative

remedies. *Id.* ("[A] grievant who files with the EEOC effectively elects, whether he realizes it or not, a federal judicial forum, and it is to that forum that the grievant should look for his remedies provided by the Human Rights Law.").