Iris **RICHARD, Jonathan Barnes, Kareem Abdul–Ali, Rosalyn Baylor, Joseph Bishop, Jr., Edward Brooks, Alvera Bullock, Eric Burden, Wilbert Burgess, Michael Camp, James Carrington, Reginald Clark, Diann R. Cooper, Desta Daggett, Raymond Flowers, Clemantis Fortson, Michael Gillis, Faye Green, Kelvin Gunn, Syed Hassan, Brian Holloway, Marc Houston, Patrick Hunt, Elvin Jackson, Christopher Joseph, Kevin Logan, Vient Aries McKoy, Venida Medlock, Mary Ellen Monk, Clark Philogene, Everse Pullen, Gregory Rosser, Tangy Shields, Leighton Shrouder, William Stellmacher, Thomas Tolson, Lisa**

Vaughn, Michael Alan Walker, Denise Walton, William Washington, Brent Whitaker, Myra Williams, Ray Williams, Stanley Williams, Gwendolyn Woodard, Erik Wright, and Terence Wynn, Plaintiffs,

v.

BELL ATLANTIC CORPORATION, Raymond W. Smith, Bruce S. Gordon, Stuart C. Johnson, Edward Sproat, Danny R. Kiser, Anthony T. Murray, Jr., and Roberta Lynch, Defendants.

Civil Action No. 96–02168 (CRR).

United States District Court, District of Columbia.

Nov. 25, 1996.

58

John W. Hermina, George Hermina, and April Sochan, Hermina Law Group, Laurel, MD, for Plaintiffs.

Vincent Cohen, Hogan & Hartson, Washington, D.C., for Defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

## I.

## INTRODUCTION

Before the Court in the above-captioned race-discrimination case is the defendants' motion to dismiss, the plaintiffs' opposition thereto, and the defendants' reply thereto. Based on the pleadings, the entire record herein, the law applicable thereto, and for the reasons expressed herein, the Court shall GRANT, with prejudice, the defendants' motion to dismiss the plaintiffs' claims under Title VII and for intentional infliction of emotional distress against defendants Raymond W. Smith, Bruce S. Gordon, Stuart C. Johnson, Edward Sproat, Danny R. Kiser, Anthony T. Murray, Jr., and Roberta Lynch ("the individual defendants"), shall GRANT, without prejudice, the defendants' motion to dismiss the plaintiffs' claims against the individual defendants under 42 U.S.C. § 1981, shall GRANT, without prejudice, the defendants' motion to dismiss the individual defendants for lack of personal jurisdiction, shall GRANT, with prejudice, the defendants' motion to dismiss the plaintiffs' claims for intentional infliction of emotional distress against defendant Bell Atlantic Corporation ("BAC"), shall DENY, without prejudice, the defendants' motion to dismiss the plaintiffs' claims under Title VII and 42 U.S.C. § 1981 against BAC, and shall DENY, without prejudice, the defendants' motion to dismiss BAC for

lack of personal jurisdiction. Further, the plaintiffs shall have sixty days to conduct discovery limited to the following three issues: (1) BAC's status as an "employer" under Title VII and 42 U.S.C. § 1981; (2) whether BAC is subject to personal jurisdiction in this Court; and (3) whether the individual defendants are subject to personal jurisdiction in this Court.

If, by the end of the sixty-day period, the plaintiffs have not dismissed their entire complaint, with prejudice, they shall file an amended complaint to correct the deficiencies in their complaint. If the plaintiffs timely file an amended complaint, the defendants shall have an additional fifteen (15) days within which either to answer the amended complaint or to renew their motion to dismiss on the issues decided by the Court without prejudice. Except where the defendants' motion is based solely on the sufficiency of the allegations in the plaintiffs' amended complaint, said motion shall be in the form of a motion for summary judgment pursuant to Fed.R.Civ.P. 56 and shall be based upon a complete, clear and undisputed factual record. Both parties shall comply fully with the requirements of Local Rule 108(h).

## II.

## BACKGROUND

Forty-eight purported current and former employees of BAC have brought a class action complaint against BAC, alleging race discrimination in the terms and conditions of their employment and retaliation. Counts I and III of the complaint allege employment discrimination on account of race and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1994), as amended. Count II alleges employment discrimination under 42 U.S.C. § 1981 (1994). Count IV alleges a common law claim of intentional infliction of emotional distress.

The Court held a status conference pursuant to Rule 16 of the Federal Rules of Civil Procedure on September 27, 1996. Counsel for the defendants stated that he would be filing a dispositive motion under Rule 12 of the Federal Rules of Civil Procedure, and requested a stay of pre-class certification discovery until the Court's resolution of said motion. The Court granted the defendant's request for a stay, pending resolution of the anticipated Rule 12 Motion. See Order of September 30, 1996.

On October 11, 1996, the defendants filed a motion to dismiss "[p]ursuant to Federal Rule of Civil Procedure 12(b)," arguing that the plaintiffs' complaint fails to allege that the plaintiffs are or were employees of BAC. Instead, the defendants argue, the plaintiffs are actually employees or former employees of several of BAC's wholly-owned subsidiaries, not BAC, and, therefore, BAC must be dismissed from this lawsuit. The defendants also moved to dismiss BAC and the individual defendants under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction, moved to dismiss the individual defendants on the separate grounds that they cannot be held personally liable for employment discrimination under Title VII and that the complaint's allegations are insufficient to state a claim against the individual defendants under 42 U.S.C. § 1981, and moved to dismiss the plaintiffs' claims for intentional infliction of emotional distress on the grounds that they are "subsumed" by their Title VII claims and, in any event, fail to state a claim upon which relief can be granted.

## III.

## DISCUSSION

**A. The Plaintiffs Have Not Created A Genuine Issue Of Material Fact That BAC Is Their "Employer" Under Title VII and 42 U.S.C. § 1981, But Will Be Permitted To Undertake Limited Discovery On This Issue.**

**1. By The Close Of A Sixty–Day, Limited Discovery Period, The Plaintiffs Shall Either Dismiss Their Complaint Or Amend It To Allege The Subsidiaries For Whom The Plaintiffs Are Or Were Employed And To Allege Specifically BAC's Role, If Any, In The Alleged Employment Discrimination.**

In the complaint, the plaintiffs allege that BAC is a "Delaware corporation providing

telecommunications services in the District of Columbia, among other locations, and is subject to the jurisdiction of this Court." Complaint at ¶ 9. Plaintiffs further allege that BAC "also owns and *operates through* numerous other entitles such as ... C & P Telephone of Maryland, ... C & P Telephone of Virginia, and Network Services, Inc," and that *"[a]ll Bell Atlantic entities are included in the term 'Bell Atlantic'." Id.* (emphasis added). Paragraphs 17 through 66 of the complaint then set forth each of the named plaintiffs' allegations of discrimination, all of which claim that the plaintiffs either are or were employed by "Bell Atlantic". *See* Complaint at ¶ 9. Given the plaintiffs' earlier definition of the term "Bell Atlantic," the complaint in effect alleges that each plaintiff was or is employed not only by BAC, but also by each of the subsidiaries. Such an allegation is nonsensical. Accordingly, the plaintiffs shall be ordered to file an amended complaint by the close of a sixty-day, limited discovery period, in which they identify each BAC subsidiary for which each named plaintiff worked or works.

█ Further, apparently relying on the "operates through" language, the plaintiffs argue that BAC is liable for the alleged discrimination by its subsidiaries under any one of a number of theories of parent corporation liability recognized by the Courts of Appeals. *See, e.g., Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993) (noting that there are at least four possible theories under which a parent company may be held liable for the discriminatory acts of its subsidiaries—the integrated enterprise theory, the agency theory, the alter ego theory and the instrumentality theory). However, the complaint contains no allegations detailing the purported integrated relationship between BAC and its subsidiaries sufficient to inform the Court which, if any, of these theories the plaintiffs have invoked. A vague and conclusory allegation that BAC "operates through" its subsidiaries does not suf-

fice. *See Alie v. NYNEX Corp.,* 158 F.R.D. 239, 246-47 (E.D.N.Y.1994) (holding that "plaintiff's vague, conclusory allegation of corporate identity of interest is wholly insufficient to withstand" the parent's motion to dismiss). Accordingly, the plaintiffs shall be ordered to supplement their allegations by the close of the limited discovery period to allege specifically how BAC is liable for discrimination allegedly carried out by or through its subsidiaries.

2. **The Defendants' Motion To Dismiss Shall Be Treated As A Motion For Summary Judgment On The Issue Of Whether Actually BAC Employs Or Employed The Plaintiffs.**

The defendants have not simply argued that the complaint is deficient on its face. They also have argued that, as a matter of undisputed material fact, the plaintiffs cannot show that BAC can be held liable for discrimination by its subsidiaries. This argument goes not to the quality of the plaintiffs' pleading, but to the factual basis which underpins the complaint. Accordingly, while the defendants have styled their motion as one under Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, it is also a *de facto* motion for summary judgment pursuant to Fed.R.Civ.P. 56, because the Court is required to look beyond the allegations in the complaint. *See* Fed.R.Civ.P. 12(b)(6); *see also Sargent v. McGrath,* 685 F.Supp. 1087 (E.D.Wis.1988) (where a parent corporation moved to dismiss the Title VII claim brought by an employee of one of its subsidiaries, but referred to matters outside of the pleadings including affidavits, deposition transcripts and corporate annual reports, the parent's motion would be treated as one for partial summary judgment and disposed of pursuant to Fed.R.Civ.P. 56); *accord Wood v. Southern Bell Tel. and Tel. Co.,* 725 F.Supp. 1244, 1247 (N.D.Ga.1989).[1] Thus, the question before the Court on the defendants' motion is whether there is a gen-

---

1. Indeed, the defendants waste little time relying on evidence outside of the Complaint. *See* Exhibit 1 to the defendants' Memorandum in Support of Motion (Affidavit of P. Allan Bulliner, Vice President—Corporate Secretary and Counsel for Bell Atlantic Corporation); Exhibit 2 to the defendants' Memorandum in Support of Motion (affidavit of Sharolyn Hessenthaler authenticating the named plaintiffs' W-2 Forms). *See also* Exhibit 2 to the defendants' Reply brief (second Bulliner affidavit).

uine issue of material fact that BAC may be held liable as an "employer" of the named plaintiffs in this employment discrimination class action under Title VII and 42 U.S.C. § 1981.[2]

### 3. Consistent With Every Court Of Appeals That Has Addressed The Issue, The Court Shall Apply The "Integrated Enterprise" Test To Determine If There Is A Genuine Issue That BAC Employs Or Employed The Plaintiffs.

Title VII defines the term "employer" to mean "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ..." 42 U.S.C. § 2000e(b) (1994). The defendants appear to argue that the plaintiffs can have only one employer for purposes of their discrimination claims, that is, if the plaintiffs are or were all employees of BAC subsidiaries, they cannot be and could not have been employees of BAC at the same time. Such an assertion is wrong as a matter of law.[3] Rather, in the parent-subsidiary context, the question of whether a parent is an "employer" turns "upon whether [the parent] is *liable* for the acts of its subsidiary ..." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1361 (10th Cir.1993) (emphasis added); *see also E.E.O.C. v. St. Francis Xavier Parochial School*, 928 F.Supp. 29, 33 (D.D.C.1996) (Harris, J.) ( [S]uperficially distinct entities that represent a single, integrated enterprise may be exposed to liability as a single employer.").

While the defendants are quick to point out that "[t]he doctrine of limited liability creates a strong presumption that a parent company is not the employer of its subsidiary's employees,"[4] they failed to inform the Court (until raised by the plaintiffs), that "the courts have applied four different tests to determine whether a parent corporation is liable for the acts of its subsidiary." *Frank*, 3 F.3d at 1362. These tests are: (1) the "agency" test under which the plaintiffs must establish that the parent exercised a significant degree of control over the subsidiary's decisionmaking; (2) the "alter ego" test which is founded in equity and permits the court to pierce the corporate veil when the court must prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime; (3) the "instrumentality" test under which the plaintiff must establish that the parent exercises extensive control over the acts of the subsidiary giving rise to the claim of wrongdoing; and (4) the "integrated enterprise" test under which the court considers (a) interrelation of operations, (b) centralized control of labor relations, (c) common management, and (d) common ownership or financial control. *Id.* at 1362 n. 2 (citations omitted).

Regardless of which test the Court applies herein, its analysis does not terminate upon reaching the undisputed conclusion that BAC and its subsidiaries are formally distinct corporate entities, as the defendants appear to

---

**2.** The analysis of whether BAC is an "employer" appears to be the same under Title VII and § 1981. *See Sargent*, 685 F.Supp. at 1089 (E.D.Wis.1988); *Alie v. NYNEX Corp.*, 158 F.R.D. 239, 245 n. 3 (E.D.N.Y.1994). Therefore, the following analysis applies to the plaintiffs' Title VII and § 1981 claims.

**3.** *See, e.g., Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 (D.C.Cir.1973) ("[Title VII] defines 'employee' as 'an individual employed by an employer,' but nowhere are there words of limitation that restrict references in [Title VII] to 'any individual' as comprehending only an employee of an employer."); *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1063 (2nd Cir. 1982) (holding that the term "employer" under Title VII is "sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether the party may technically be described as an 'employer' ... at common law."), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 3566, 77 L.Ed.2d 1406 (1983); *Alie*, 158 F.R.D. at 245 ("The law is clear that an individual may be the employee of more than one 'employer' for Title VII purposes ...").

**4.** *Frank*, 3 F.3d at 1362; *accord Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 980 (4th Cir.1987) (parent "cannot be the employer simply because it is the parent company" of the subsidiary; "when a subsidiary hires employees, there is a strong presumption that the subsidiary, not the parent company is the employer").

suggest. To the contrary, it is only the beginning of the analysis, whereupon the Court must determine the degree of control, if any, Bell Atlantic Corporation exercises over its subsidiaries' employment practices.

To the Court's knowledge, this Circuit has yet to address the proper test to apply when determining whether a parent company should be held liable for the alleged discriminatory acts of its subsidiaries. However, the clear majority of circuits to have addressed the issue have applied the four-factor "integrated enterprise" test noted above. *See Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1241 (2nd Cir.1995); *Garcia v. Elf Atochem North America,* 28 F.3d 446, 450 (5th Cir.1994); *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993); *Johnson v. Flowers Indus., Inc.,* 814 F.2d 978, 980 (4th Cir. 1987); *Baker v. Stuart Broadcasting,* 560 F.2d 389, 392 (8th Cir.1977); *accord St. Francis Xavier Parochial School,* 928 F.Supp. at 33. Thus, the Court herein shall apply the integrated enterprise test to the evidence presented to determine if there is a genuine issue.

 In applying the integrated enterprise test, courts have noted the following to be probative evidence that the parent employs the subsidiary's employees for purposes of Title VII liability:

(1) Parent company employees hired and fired the subsidiary employees and/or authorized lay offs, recalls, and promotions of such employees. *See Cook,* 69 F.3d at 1241; *Frank,* 3 F.3d at 1362; *Johnson,* 814 F.2d at 981; *Trevino v. Celanese Corp.,* 701 F.2d 397, 404 (5th Cir.1983).

(2) The parent company routinely transferred employees between it and its subsidiary, used the same work force, and/or handled the subsidiary's payroll. *See Johnson,* 814 F.2d at 981; *Armbruster v. Quinn,* 711 F.2d 1332, 1338 (6th Cir.1983).

(3) The parent company exercises more than general oversight of the subsidiary's operations by supervising the subsidiary's daily operations, such as production, distribution, purchasing, marketing, advertising, and accounts receivable. *See Cook,* 69 F.3d at 1241; *Johnson,* 814 F.2d at 981–82; *Armbruster,* 711 F.2d at 1338.

(4) The parent and subsidiary have common management in the form of interlocking boards of directors and/or common officers and managers. *See Frank,* 3 F.3d at 1364; *Johnson,* 814 F.2d at 982.

(5) The parent and subsidiary fail to observe basic formalities like keeping separate books and holding separate shareholder and board meetings. *See Johnson,* 814 F.2d at 981.

(6) The parent and subsidiary fail to maintain separate bank accounts. *See Johnson,* 814 F.2d at 982.

(7) The parent and subsidiary file joint tax returns. *See Johnson v. Flowers Indus., Inc.,* 814 F.2d at 982.

No one of the above-listed factors is dispositive, although evidence tending to show "centralized control of labor relations"—factors (1) and (2)—should be the focus of the Court's analysis. *See Cook,* 69 F.3d at 1241; *Armbruster,* 711 F.2d at 1337; *accord Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 582 (7th Cir.1993) (ADEA case). Thus, the critical question on summary judgment is: Is there a genuine issue that the parent controls the day-to-day employment decisions of the subsidiaries that employ or employed the plaintiffs? *See Frank,* 3 F.3d at 1363 (10th Cir.1993); *St. Francis Xavier Parochial School,* 928 F.Supp. at 34.

 It is important to note that several factors are of low or no probative value to this inquiry: (1) that the operations of the subsidiaries, themselves, are interrelated, *Frank,* 3 F.3d at 1362; (2) that the parent ultimately benefits from the work of the subsidiary, *id.;* (3) that the supervisors of the subsidiary ultimately reported to officers in the parent company, or that certain high level management employees perform functions for both companies, *id.; Kelber v. Forest Electric Corp.,* 799 F.Supp. 326, 331 (S.D.N.Y.1992); (4) that the parent has promulgated broad general policy statements regarding employment matters, including

statements governing equal employment opportunity issues, particularly where the subsidiary has discretion concerning whether to use them, *Frank*, 3 F.3d at 1363; *Wood*, 725 F.Supp. at 1249; (5) that the parent and subsidiary have common advertising guidelines, *Frank*, 3 F.3d at 1363 n. 3; (6) that the plaintiffs believed that they were employees of the parent, *Marzano v. Computer Science Corp. Inc.*, 91 F.3d 497, 514 (3rd Cir.1996); and (7) that the plaintiffs belonged to the parent's pension plan, or that the parent served as the plan administrator for the subsidiary's severance pay plan, *id.; Frank*, 3 F.3d at 1363.

### 4. The Court Will Deny The Defendants' Motion For Summary Judgment, Without Prejudice, Because The Plaintiffs Have Articulated Several Bases Upon Which BAC Could Be Found To Be Their "Employer" And Because There Has Been No Formal Discovery In This Case.

 The defendants have submitted the following information in support of their position that BAC is and was not the plaintiffs' employer: (1) the first Bulliner affidavit; (2) the second Bulliner affidavit; (3) the Hessenthaler affidavit; and (4) the named plaintiffs' W–2 Forms, appended to the Hessenthaler affidavit.

The first Bulliner affidavit avers that BAC is the parent corporation of various subsidiary companies, including Bell Atlantic—Virginia, Inc. (formerly The Chesapeake and Potomac Telephone Company of Virginia), Bell Atlantic Network Services, Inc. (formerly Bell Atlantic Management Services, Inc.), Bell Atlantic—Washington, D.C., Inc. (formerly The Chesapeake and Potomac Telephone Company) and Bell Atlantic—Maryland, Inc. (formerly The Chesapeake and Potomac Telephone Company of Virginia). First Bulliner Aff. at ¶ 4. The affidavit then states that a search of the named plaintiffs' payroll records "disclosed no evidence that any of the named plaintiffs ever had been employed by [BAC]," but rather that all are or were employed by subsidiaries. *Id.* at ¶ 5. The Hessenthaler affidavit similarly asserts that, based on the plaintiffs' W–2

Forms, "[n]one of the plaintiffs is or was employed by Bell Atlantic Corporation itself," but by several of its subsidiaries. Hessenthaler Aff. at ¶ 3. Implicit in this affidavit testimony is the dubious assumption that one's payroll records is dispositive of employer status under Title VII and 42 U.S.C. § 1981. This is clearly not the case. Indeed, even if the W–2's happen to identify the subsidiaries that employ each plaintiff, if BAC prepares the W–2's for the subsidiaries' employees, such a fact would weigh in favor of finding BAC to be the plaintiffs' employer.

While the second Bulliner affidavit is conclusory in parts, it does testify competently to the following facts:

(1) BAC is a Delaware Corporation with its principal place of business in Philadelphia, Pennsylvania that serves as a regional holding company and parent corporation of a number of subsidiaries that provide telephone services to certain mid-Atlantic states, including Maryland and Virginia, and to the District of Columbia. Second Bulliner Aff. at ¶ 2.

(2) BAC does not provide any telephone services. *Id.*

(3) BAC and its subsidiaries each maintain a separate corporate existence, and observe all corporate formalities. *Id.* at ¶ 3.

(4) There is no overlap between the boards of directors of BAC and the subsidiaries for whom the named plaintiffs are or were employed, namely, Bell Atlantic Network Services, Inc., Bell Atlantic—Maryland, Inc., and Bell Atlantic—Virginia, Inc. *Id.* at ¶ 4.

(5) All of the at-issue subsidiaries are adequately capitalized, as evidenced by the fact that their respective operations, management, payroll records, budgets, workforces and bank accounts are separate from those of BAC. *Id.*

(6) BAC does not control its subsidiaries' employment decisions "below senior management level"—a level purportedly higher than that of any of the named plaintiffs in this lawsuit. *Id.* at ¶ 5.

(7) BAC does not dictate its subsidiaries' labor relations policy because the subsidiaries are "free to choose to bargain together or separately, and to decide to have common or separate labor relations staff, [and e]ach subsidiary makes and implements its own labor relations policy under the direction of its officers." *Id.* at ¶ 6.

Thus, the second Bulliner affidavit makes a *prima facie* showing that BAC is not involved in the day-to-day employment decisions of the subsidiaries that employ or employed the plaintiffs.

The plaintiffs, by contrast, claim that "evidence abounds" to the contrary, and have attached no less than 38 exhibits to prove their point. While many of these exhibits are immaterial,[5] others suggest that it would not be proper for the Court to conclude that "as a matter of undisputed material fact BAC is not the plaintiffs' employer," if for no other reason than that the plaintiffs have not had the benefit of formal discovery:[6]

### a. BAC's Common Compensation Scheme, Severance Pay Plan, And Uniform Test Battery (Exhibits 6 and 7).

The plaintiffs have included in Exhibit 6 documents that purport to be a BAC compensation plan for its subsidiaries. The documents state that the "compensation plan is a major step forward in integrating the compensation plans of all Bell Atlantic entities. The plan is designed to achieve more commonality among the compensation programs of the Bell Atlantic entities, while continuing to focus Bell Atlantic salary practices on the marketplace." Among other things, the plan provides for performance-based merit increases and other awards.

Apparently related to the compensation plan, an accompanying "Manager's Handbook" states that the purpose of the plan is "to provide a consistent framework for incentive compensation decisions throughout participating companies and to ensure a direct relationship between awards granted and individual performance contributions to the team, as measured through the appraisal process." *See* Exhibit 6 (Manager's Handbook at 2). The Handbook suggests that only managers are eligible for the incentives, and, therefore, the emphasis on performance evaluation applies only to the evaluation of managers, not employees below the management level. *See* Exhibit 6 (Manager's Handbook at 8).

The plaintiffs also have attached documents which suggest that BAC has had in effect at least as of June 1, 1992 a Separation Pay Plan ("the Plan") which applies to all full-time and part-time employees below a particular salary grade at the BAC subsidiaries. The Plan governs severance payments in the cases of voluntary resignation, discharge for misconduct, and terminations due to poor performance, a reduction in force, or corporate restructuring.

The Plan and other documents comprising Exhibit 6 further provide that BAC's "Vice President—Human Resources, in conjunction with the Officer of the affected organization, will determine" whether to impose an involuntary reduction in force or a voluntary force

---

5. For instance, the plaintiffs point to the fact that BAC was able to gather the W–2's of the 48 named plaintiffs in a few weeks' time. The plaintiffs, however, fail to demonstrate, let alone suggest, how BAC's mere access to certain payroll information proves that BAC is at any way involved in the employment practices of its subsidiaries. The plaintiffs also refer to ambiguous policy statements of BAC, such as "Unless we work together as one company rather than a collection of companies—we will not succeed." *See* Exhibits 1, 4. Vague references to the common mission of BAC and its subsidiaries are not probative of whether BAC participates in its subsidiaries' employment decisions. Finally, the plaintiffs cite BAC's purported policy to promote and advertise the identifier "Bell Atlantic" to its employees and to the public as a single brand identifying the products and services offered by BAC and its subsidiaries (Exhibits 2, 3, 19, 20, 21, 22, 23, 27, and 28). The fact that BAC seeks to market its telecommunications services with a "unified" front, without more, is not probative of BAC's involvement, if any, in its subsidiaries' employment practices.

6. Even though the stack of exhibits proffered by the plaintiffs has not been authenticated and is rife with hearsay, and therefore, could be ignored by the Court (*see* Fed.R.Civ.P. 56(e)), the Court will not do so because the plaintiffs have not had the benefit of any formal discovery in this case.

management program, and that performance is one factor to be used to select positions to be eliminated in a reduction in force.[7]

Exhibit 7 contains a newsletter entitled *Let's Talk HR* which purportedly is sent from BAC's corporate office to employees of the BAC subsidiaries. Page three of the newsletter refers to "Bell Atlantic's Universal Test Battery, or UTB, ... a single computerized test that measures the cognitive abilities and interpersonal skills required for associate jobs." According to the plaintiffs, every new hire and applicant for promotion is subject to the UTB. Although the plaintiffs have offered no admissible evidence in support of this assertion, the defendants have not contested it, suggesting to the Court that BAC may play a direct role in the hiring and/or promotion of employees of BAC subsidiaries.

In sum, Exhibits 6 and 7 suggest that BAC may be involved in the human resource functions of its subsidiaries, at least with regard to (a) the evaluation and compensation of managers; (b) the provision of severance benefits to employees of BAC subsidiaries; and (c) the development and implementation of testing criteria to determine if applicants and employees are eligible for hire or promotion. While the Court notes that Exhibit 6 also suggests that the subsidiaries have autonomy with respect to the day-to-day implementation of its employment practices (e.g., it is up to the subsidiary to determine whether an employee is meeting performance

standards),[8] the record herein is entirely too confused for the Court to conclude at this stage that there is no genuine issue as to the role of BAC in its subsidiaries' employment practices.

**b. BAC's Uniform Transfer Policy (Exhibit 8).**

The plaintiffs have attached as Exhibit 8 what purports to be BAC's Regional Associate Mobility Plan ("RAMP") which permits associates of the BAC subsidiaries to "apply for associate job vacancies anywhere within the Bell Atlantic region."[9] Exhibit 8 provides that the RAMP is to supersede the transfer plans of Bell Atlantic–D.C., Bell Atlantic–Maryland, Bell Atlantic–Virginia, and Bell Atlantic Network Services, among others. It further states that the RAMP is "Bell Atlantic's new, regionwide plan for filling associate positions in Network Services Group (NSG) companies," that "RAMP is the latest in a series of staffing process improvements implemented by Human Resources (HR) to support Bell Atlantic's goal of maintaining a highly skilled workforce that's able to delight customers and beat the competition," and that RAMP "will allow us to ... [s]tandardize the process for determining candidate qualifications for the selection process." Finally, this issue of *Let's Talk HR* also · states that "[w]hile supervisors may wish to continue to rely on their HR representative to review applications and make the final selection decisions, they will now be able

---

7. Exhibit 7 suggests that employees of BAC subsidiaries also may participate in a common pension plan, stock ownership plan, life insurance plan, medical insurance plan, dental plan, and vision insurance plan. As noted above, however, that BAC administers employee benefits for its subsidiaries is not relevant to the inquiry of whether it is an "employer" under Title VII and § 1981.

8. For instance, the Plan provides that the subsidiaries and their respective human resources staffs "have the responsibility for managing the day-to-day operations of the Plan." Similarly, the Plan states that a termination for " 'job performance reasons' means that the Employee is either discharged involuntarily, or resigns at the Company's request, where the Company concludes that the Employee has failed to meet ... the job performance standards, requirements, or expectations of the Company ...;" under the

Plan, the term "Company" refers to any one of BAC's subsidiaries, not BAC itself.

9. Under the RAMP, each associate fills out a Personal Employee Data ("PED") form to record his or her work experience, higher education and training, as well as certain skills and abilities. If the associate applies for a job, the information on the PED will be matched with the requirements of the job opening and any additional requirements discussed in the job advertisement on BAC's "STAR*JOBS" telephone system. To be eligible for an associate job, the associate, among other things, must have an up-to-date PED form, at least a "Satisfactory" performance ranking, and good attendance, and must meet the UTB test requirements or be "UTB exempt." By calling an 800 telephone number, an associate can access a telephonic menu of options regarding job openings by geographic area and job type.

to actively participate in the review and selection process after completion of RAMP Selection Process training." Thus, Exhibit 8 suggests that BAC may coordinate and control a significant human resources function vis a vis the subsidiaries, namely the transfer and promotion of employees within the mid-Atlantic region.

### c. Uniform HR Guidelines, Equal Employment Policies, and Training Center (Exhibits 10, 11, 30 and 33).

Exhibit 10 purports to be Human Resources Guidelines issued on June 1, 1994 which "supersede most Network Services Group Company personnel practices, instructions and/or guidelines." The stated purpose of these guidelines is "to provide management employees with one source of direction. that supports fair and consistent application of HR policy across all business organizations." Section One of the Guidelines governs equal employment opportunity issues.

Exhibit 11 purports to be an Employee Code of Business Conduct, and includes policies governing equal employment opportunity and affirmative action. Exhibit 11 strongly intimates that such policies have mandatory application to BAC's subsidiaries. Recipients of the booklet are required to review the booklet, sign an acknowledgment of its receipt and return it to their supervisors.

Exhibit 33 purports to be Disciplinary Guidelines for Supervisors at BAC's subsidiaries. The stated purpose of these Guidelines is "to assist managers in situations where disciplinary action against an employee is or may be appropriate, and to inform managers of reporting requirements for certain types of violations." The Guidelines provide that "Managers are expected to be familiar with these Guidelines and to consult them in any situation where discipline is or may be appropriate." They also suggest that managers consult "Legal (normally a labor/employment attorney), as appropriate, in situations where discipline is or may be appropriate," and that they "call the [Equal Employment Opportunity/Affirmative Action] Hotline to have suspected violations of the Company's EEO/AA policies investigated . . ."

Exhibit 33 also contains a form called "Management Performance Appraisal and Development Plan," which purports to provide a "systematic way" of evaluating all managers. The evaluator is supposed to indicate whether the manager "[d]emonstrates a good understanding of Bell Atlantic's commitment to ensuring equality in employment opportunities and maintaining a work environment without unlawful discrimination and supports this goal in the conduct of his or her responsibilities." A similar guide from 1990 seeks to measure how well managers "[t]rain[ ] and develop[ ] subordinates to perform more effectively" and whether they "[h]elp[ ] to develop employee potential through counseling, coaching, appraisal, and provision of suitable learning opportunities."

While BAC's general employment policy guidelines do not, in themselves, make BAC the employer of its subsidiaries' employees, some of the excerpts quoted above suggest that these policies are required to be followed by managers at BAC subsidiaries and further appear to suggest that managers contact a common legal department and/or an EEO hotline before taking employment actions such as employee discipline. Such suggestions, if supported by admissible evidence, would weigh in the plaintiffs' favor on the "employer" issue.

Finally, attached as part of Exhibit 30 is an issue of *Let's Talk HR* that suggests that BAC has consolidated its training services into a single resource, The Bell Atlantic Learning Center. Before the consolidation, "the training and development services—Career Services, Continuous Learning, Organizational Development, Leadership Development, Performance Enhancement, Diversity Management and Work/Life Strategies— were all part of different organizations . . ." Exhibit 30. The Bell Atlantic Learning Center encompasses all aspects of training under one "roof". *Id.* While a parent's stringent control of training opportunities is not necessarily evidence that the parent is the employer of such employees (*see Evans v. McDonald's Corp.,* 936 F.2d 1087, 1091 (10th Cir.1991)), the plaintiffs have alleged discrim-

ination in training opportunities, and, therefore, Exhibit 30 buttress the plaintiffs' allegation that BAC is or was their employer for purposes of Title VII and § 1981. *See* Complaint at ¶ 1.

Based on the foregoing and the fact that there has been no formal discovery in this case, the Court declines to grant summary judgment to BAC at this time. *See, e.g., Sargent v. McGrath*, 685 F.Supp. 1087, 1090 (E.D.Wis.1988) ("[E]ven the rather weak showing of a connection in labor relations between the two corporations raises a genuine issue of material fact for trial with respect to the nature and extent of the interrelationship between [the parent] and its subsidiary."). However, the Court's denial of summary judgment to BAC on the "employer" issue is without prejudice to BAC's right to renew its motion at the completion of a sixty-day, limited discovery period on this issue and on the jurisdictional issue discussed below. This period should afford the plaintiffs the opportunity to authenticate the relevant exhibits and to discover any other admissible evidence that may create a genuine issue of material fact regarding BAC's "employer" status. If, by the close of limited discovery, the plaintiffs discover that they cannot allege in good faith that BAC is their "employer," they shall dismiss BAC from this lawsuit, with prejudice. Otherwise, at the close of limited discovery they shall file an amended complaint to comply with this Opinion and accompanying Order, whereupon BAC shall have an additional fifteen days within which either to answer the amended complaint or to renew their motion to dismiss in the form of a summary judgment motion based upon a complete, clear and undisputed factual record.

Should BAC renew its motion, the Court hereby advises the parties that they shall comply with Local Rule 108(h) which requires each motion for summary judgment to be "accompanied by a statement of material facts as to which the moving party contends there is no genuine issue ..." and requires an opposition to such a motion to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated ..." The Court will not look favorably on a party's failure to comply fully with Rule 108(h). If at that time there is no genuine dispute that BAC did not and does not participate in the evaluation, training, promotion, discipline, and assignment of work to the plaintiffs, the Court shall dismiss BAC from this lawsuit, with prejudice.

**B. The Defendants' Motion To Dismiss For Lack Of Personal Jurisdiction Is Denied, Without Prejudice, With Respect To BAC, And Granted, Without Prejudice, With Respect to the Individual Defendants, Pending A Sixty–Day, Limited Discovery Period.**

The defendants have moved to dismiss all of the defendants for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2). To withstand a motion to dismiss for lack of personal jurisdiction, the plaintiffs "must make a *prima facie* showing of the pertinent jurisdictional facts" by alleging " 'specific acts connecting [the] defendant[s] with the forum.' " *First Chicago Intern. v. United Exchange Co., Ltd.*, 836 F.2d at 1378 (D.C.Cir.1988) (quoting *Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1208 n. 5 (9th Cir.1980)). While at this stage, the Court will consider all allegations of jurisdictional facts in a light most favorable to the assertion of personal jurisdiction, conclusory jurisdictional statements will not suffice. *See First Chicago Intern.*, 836 F.2d at 1379 (bare allegations of "conspiracy or agency is insufficient to establish personal jurisdiction"); *Sunlite, Inc. v. BfG Bank AG*, 849 F.Supp. 74, 76 (D.D.C.1994) (plaintiff's allegation that a company part-owned by the defendant and subject to personal jurisdiction acted as an agent of the defendant was conclusory where the plaintiff failed to provide a factual foundation for this assertion).

The Court is able to glean the following jurisdictional allegations from the complaint: (1) "the unlawful employment practices and tortious acts complained of [in the complaint] were committed in the District of Columbia, among other [unspecified] locations;" (2) "the defendants regularly conduct large

amounts of business in the District of Columbia;" [10] (3) "Bell Atlantic Corporation ... is a Delaware corporation providing telecommunications services in the District of Columbia, among other locations, ... and owns and operates through numerous [subsidiaries];" (4) Raymond W. Smith "is ultimately responsible for the discriminatory actions and practices complained of;" and (5) Bruce S. Gordon, Stuart C. Johnson, Edward Sproat, Danny R. Kiser, Anthony Murray, Jr., and Roberta Lynch are "responsible for implementing and allowing discriminatory practices and actions against class members." *See* Complaint at ¶¶ 3, 9–16.

Under the District of Columbia Code, there are three possible ways that this Court can have personal jurisdiction over a corporation like BAC: (1) the Court may have general personal jurisdiction, because BAC is "present" in the District of Columbia by virtue of "doing business" in the District; [11] (2) the Court may have general personal jurisdiction because BAC is domiciled in, organized under the laws of, or maintaining its principal place of business in the District; [12] and (3) the Court may have specific personal jurisdiction under the District's long-arm statute, because of certain conduct by BAC, like transacting business in the District or causing tortious injury in the Dis-

trict.[13] Notwithstanding a statutory basis to assert personal jurisdiction, the assertion of jurisdiction over a defendant also must comport with Due Process. *See International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

As discussed below, the plaintiffs have not yet made a *prima facie* showing of either general or specific jurisdiction over BAC under the D.C.Code. However, the plaintiffs have not had the benefit of formal discovery, and, therefore, they shall be permitted sixty days from the date of the Order accompanying this Opinion within which to obtain the necessary jurisdictional facts or else dismiss this lawsuit against BAC. Additionally, the plaintiffs have not pled any jurisdictional facts with respect to the individual defendants, nor have they attempted to supplement the allegations in their complaint with such facts. Therefore, the individual defendants shall be dismissed from this case, without prejudice. As with BAC, the plaintiffs shall have sixty days to obtain the necessary jurisdictional facts or else dismiss the lawsuit with respect to the individuals.

### 1. The Court Does Not Have General Personal Jurisdiction Over BAC Under D.C.Code § 13–422.

The plaintiffs do not claim that BAC is domiciled in, organized under the laws of, or

---

**10.** The plaintiffs fail to specify which defendants purportedly conduct "large amounts of business in the District of Columbia."

**11.** "In an action against a foreign corporation doing business in the District, process may be served on the agent of the corporation or person conducting business ..." D.C.CODE § 13–334(a) (1995). *See also Crane v. Carr*, 814 F.2d 758, 763 (D.C.Cir.1987) ("An enterprise incorporated and even headquartered elsewhere may operate so continuously and substantially within a state that it is fair to allow anyone to sue the enterprise in that state on any claim, without regard to where the claim arose.") (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 318, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945)).

**12.** "A District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its principal place of business in, the District of Columbia as to any claim for relief." D.C.CODE ANN. § 13–422 (1995).

**13.** "(a) A District of Columbia court may exercise personal jurisdiction over a person, who acts

directly or by an agent, as to a claim for relief arising from the person's—

(1) transacting any business in the District of Columbia;
(2) contracting to supply services in the District of Columbia;
(3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
(4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia;
(5) having an interest in, using, or possessing real property in the District of Columbia;

. . . . .

(b) When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him."
D.C.CODE ANN. § 13–423 (1995).

maintaining its principal place of business in the District. Moreover, it appears from the second Bulliner affidavit proffered by the defendants that BAC is not domiciled in, organized under the laws of, or maintaining its principal place of business in, the District of Columbia. *See* second Bulliner Aff. at ¶ 2. Thus, this Court does not have general personal jurisdiction under D.C.CODE ANN. § 13–422 (1995).

**2. The Court May Have General Personal Jurisdiction Over BAC Pursuant To D.C.Code § 13–334(a), But The Plaintiffs Have Not Yet Made A *Prima Facie* Showing.**

▮ To support a finding of general jurisdiction over BAC, section 13–334(a) of the D.C.Code demands a " 'continuing corporate presence in the forum ... directed at advancing the corporation's objectives.' " *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 675 (D.C.Cir.1996) (quoting *AMAF Int'l Corp. v. Ralston Purina Co.,* 428 A.2d 849, 851 (D.C.1981)). In essence, the plaintiffs have argued that BAC has continuing contacts with the District through its own conduct and through the conduct of its D.C. subsidiaries which, the plaintiffs seem to argue, should be imputed to BAC.

The parties do not appear to dispute that the BAC subsidiaries that are located and conduct business in the District are subject to the jurisdiction of this Court. Thus, if these contacts are imputed to BAC, it is likely that this Court would have personal jurisdiction over BAC. In *El Fadl,* as herein, the plaintiff attempted to attribute a subsidiary's contacts with the District to the parent company. The Court of Appeals held that a parent-subsidiary relationship alone is insufficient to impute the subsidiary's contacts with the District to the parent, unless (a) the parent and subsidiary " 'are not really separate entities,' " or (b) the parent and subsidiary have an agency relationship such that the "local subsidiary's contacts can be imputed to the foreign parent." (quoting *I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc.,* 699 F.2d 1254, 1259 (D.C.Cir.1983) and citing *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 419 (9th Cir. 1977)).

▮ This Circuit adheres to the formalistic approach announced by the Supreme Court in *Cannon Manufacturing Co. v. Cudahy Packing,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925) to determine whether a parent and subsidiary are "really separate entities." *See El–Fadl,* 75 F.3d at 675–76 (citing *Cannon); I.A.M.,* 699 F.2d at 1258–59 (same). In *Cannon,* a Maine corporation was sued for breach of contract in a North Carolina court; the Maine corporation had used an Alabama corporation with an office in North Carolina as an instrumentality to market its products in North Carolina and to collect the purchase price for such products. *Cannon Manufacturing Co.,* 267 U.S. at 335–37, 45 S.Ct. at 251. Writing for the Court, Justice Brandeis observed that "[t]hrough ownership of the entire capital stock and otherwise, the [Maine corporation] dominate[d] the Alabama corporation, immediately and completely, and exert[ed] its control both commercially and financially ..." *Id.* at 335, 45 S.Ct. at 251. Nevertheless, the existence of the Alabama corporation as a distinct corporate entity was observed in all respects. For instance, they kept separate financial books and "[a]ll transactions between the two corporations [were] represented by appropriate entries in their respective books in the same way as if the two were wholly independent corporations." *Id.* Based on these findings, the Maine corporation was not amenable to jurisdiction in North Carolina: "The corporate separation, though perhaps merely formal, was real. It was not pure fiction." *Id.* at 337, 45 S.Ct. at 251.

▮ As in *Cannon,* the plaintiffs herein have made no showing that the corporate separation between BAC and its subsidiaries is "pure fiction." It is not enough that BAC wholly owns its subsidiaries. *See El–Fadl,* 75 F.3d at 676. Indeed, the relevant evidence in the record points directly to the opposition conclusion. *See* Second Bulliner Aff. at ¶¶ 3 and 4 (detailing observance of corporate formalities, lack of overlapping directorships, adequate capitalization of BAC subsidiaries, separate operations, payroll rec-

**70**

ords, budgets, and bank accounts); *cf. I.A.M. Nat'l Pension Fund,* 699 F.2d at 1259 (finding general jurisdiction over parent under *Cannon* and its progeny where subsidiary "was an indistinguishable part of its larger parent").

■ Thus, to impute the subsidiaries' contacts to BAC, the plaintiffs would need to make a *prima facie* showing that the BAC subsidiaries that employ or employed them in the District have an agency relationship with BAC. To determine if a party is an agent for jurisdictional purposes, "the court looks to the entire relationship for evidence of mutual consent and a sufficient degree of control exercised by the principal." *Schwartz v. CDI Japan, Ltd.,* 938 F.Supp. 1, 7 (D.D.C.1996) (Urbina, J.) (citing *Johnson v. Bechtel Assoc. Professional Corp.,* 717 F.2d 574, 580 (D.C.Cir.1983), *rev'd on other grounds sub nom., Washington Metro. Area Transit Auth. v. Johnson,* 467 U.S. 925, 104 S.Ct. 2827, 81 L.Ed.2d 768 (1984)); *see also Rose v. Silver,* 394 A.2d 1368, 1371 (D.C. 1978) (" '(a)gency is the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act' ") (quoting Restatement (Second) of Agency § 1(1) (1957), *reh'g denied,* 398 A.2d 787 (D.C.1979)).

This agency test is substantially similar to the "integrated enterprise" test discussed in connection with the question of whether BAC employs or employed the plaintiffs for purposes of Title VII and 42 U.S.C. § 1981. *See, e.g., Frank,* 3 F.3d at 1362 n. 2 (under "integrated enterprise" test, the court considers interrelation of operations, centralized control of labor relations, common management, and common ownership or financial control). For the same reasons that the Court denied summary judgment for BAC on the "employer" issue, it finds that the plaintiffs, with formal discovery on the jurisdictional issue, may be able to proffer sufficient

evidence to show that BAC and its subsidiaries have an agency relationship sufficient to afford this Court personal jurisdiction over BAC. *See El–Fadl,* 75 F.3d at 676 (holding that the plaintiff's jurisdictional allegations were insufficient, but that he had sufficiently demonstrated that he could supplement through discovery).

The Court also notes that the plaintiffs assert in their opposition that, regardless of its subsidiaries' contacts with the District, BAC has its own direct contacts with the District. Such alleged contacts include, but are not necessarily limited to: (a) BAC's development and implementation of the Uniform Test Battery for the hiring, promotion and transfer of employees within the District of Columbia and elsewhere; (b) BAC's development and implementation of employment policies, which may be mandatory for BAC subsidiaries in the District; (c) BAC's creation of a training center for employees of subsidiaries who work in the District and elsewhere; (d) BAC's promotion of the "Bell Atlantic" corporate moniker on employee identification cards, trucks and phone books and in advertisements, allegedly causing the public to identify the subsidiaries with the parent and vice versa; (e) statements in BAC's 1994 Annual Report suggesting integration between BAC and its subsidiaries, such as "Bell Atlantic Corporation ... is a diversified telecommunications company. [Its] network operations subsidiaries provide voice and data transport and calling services, network access, directory publishing and public telephone services to customers in the mid-Atlantic region ... [BAC] and its subsidiaries have approximately 61,800 employees ...;" and (f) financial profit from its subsidiaries' activities in the District.

Although the plaintiffs have not authenticated any of the materials that allegedly show the above-listed contacts, if grounded in competent evidence, such contacts likely would support a finding of general jurisdiction over BAC.[14] Accordingly, the plaintiffs

---

14. *See Hoffman v. United Telecomm., Inc.,* 575 F.Supp. 1463, 1472–76 (D.Kan.1983) (finding general jurisdiction over foreign subsidiary subsidiaries in an employment discrimination class action where the in-State parent (a) advertised

"a unified image to the public," (b) disseminated policies to its subsidiaries, some of which were mandatory; (c) had the authority to designate any policy as mandatory; (d) had considerable control over personnel functions of the subsidiar-

shall have the opportunity, through limited discovery, either to establish the necessary jurisdictional facts or to dismiss BAC from this lawsuit at the end of discovery.

### 3. The Court Also May Have Specific Personal Jurisdiction Over BAC Under D.C.Code § 13–423, But The Plaintiffs Have Not Yet Made A *Prima Facie* Showing.

### a. Specific Jurisdiction Under § 13–423(a)(1).

■ D.C.Code Section 13–423(a)(1) would authorize this Court to exercise jurisdiction over BAC if (a) the plaintiffs' claims arise from BAC's "transacting any business in the District of Columbia," D.C.CODE ANN. § 13–423(a)(1) (1995) and (b) the plaintiffs claims are related to the acts forming the basis for personal jurisdiction. *See El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 672 (D.C.Cir.1996) (holding that reliance on the D.C. long-arm statute was misplaced because the plaintiff's wrongful termination claim were not related to any of the defendant's general business contacts with the district); *First Chicago Intern. v. United Exchange Co., Ltd.,* 836 F.2d 1375, 1377 n. 2 (D.C.Cir. 1988) (Because the plaintiff relied on § 13–423(a)(1), "the district court properly confined its jurisdictional analysis to those contacts of the defendant that could be said to have *given rise to the claims charged* in the plaintiff's complaint.") (emphasis in original); *Dickson v. United States,* 831 F.Supp. 893, 897 n. 5 (D.D.C.1993) (same).

The plaintiffs make the following allegations relevant to whether BAC transacts business in the District of Columbia: (1) "the

defendants"—the plaintiffs do not specify which defendants—"regularly conduct large amounts of business in the District of Columbia," Complaint at ¶ 3; and (2) "Bell Atlantic Corporation ... is a Delaware corporation providing telecommunications services in the District of Columbia." Complaint at ¶ 9.

These allegations do not make out a *prima facie* showing of jurisdiction over BAC, because they are conclusory. *See Novak–Canzeri v. Saud,* 864 F.Supp. 203, 206 (D.D.C. 1994) (Friedman, J.) (allegations that the defendants " 'otherwise transact[ed] business in the District' [and] ... that Defendants entered into an agreement in the District whereby services were to be supplied in the District, and that they engaged in conferences, discussions and meetings in the District" did make out a *prima facie* showing of jurisdiction because they were conclusory and because the plaintiff offered no factual basis to support these assertions). Additionally, the plaintiffs have not shown how this purported "large amount of business" in the District is related to their employment discrimination claims.

In their opposition to the defendants' motion, the plaintiffs, point to what they purport to be additional evidence of BAC's business contacts with the District: (1) employees in the District of Columbia have identification cards on them that include the "Bell Atlantic" moniker, but not that of the subsidiary; (2) telephone books have "Bell Atlantic" printed on them; (3) vehicles have "Bell Atlantic" printed on them; (4) "reasonable people would believe that ... advertising refers to Bell Atlantic as a unified conglomerate ...

---

ies in the "high level" management positions; (e) had mandatory accounting and reporting requirements; (f) rendered services in the forum state that directly benefited the subsidiaries in their respective states; and (g) gathered and centralized information on key management employees of all subsidiaries in order to analyze future human resource needs). As in *Hoffman,* the instant suit involves an employment discrimination class action against telecommunication providers. *See also Stith v. Manor Baking Co.,* 418 F.Supp. 150, 152–54 (W.D.Mo.1976) (employment discrimination class action under Title VII and § 1981; finding general personal jurisdiction over a foreign holding company where it (a) actively trained and supervised the subsidiary's

employees; (b) employed "roving supervisors" who periodically visited the subsidiary and supervised employee performance; and (c) regularly transferred employees to positions with the holding company or with other subsidiaries); *In re Tutu Wells Contamination Litig.,* 846 F.Supp. 1243, 1263–67 (D.V.I.1993) (toxic waste clean-up case); finding specific jurisdiction over holding company under analogue to the District's § 13–423(a)(4) based on (a) statements in annual report that it controlled 25% of the market in the forum; (b) company's mandatory environmental policies; and (c) forum subsidiary's use of the company's trademark and company's benefit from this marketing and advertising).

[and] would undoubtedly say, if asked, that Bell Atlantic does business in the District of Columbia;" (5) "James Earl Jones" surely would be disappointed to find out that he advertises only for a small handful of employees who, as it turns out, do not actually engage in any telephone operations; and (6) BAC "has willingly reaped the profits of that promotion from D.C. residents and organizations ..."

■ These allegations do not support a finding of jurisdiction. First, the plaintiffs fail to cite any admissible evidence in support of these six assertions, apparently asking the court to take judicial notice of their inherent truth. This the Court will not do. Second, several of these assertions boarder on the frivolous. That "reasonable people" and James Earl Jones would say that BAC does business in the District is not at all probative of BAC's amenability to this Court's jurisdiction, which is an intricate legal determination for the Court.

The employees' alleged possession of "Bell Atlantic" identification cards, the "Bell Atlantic" phone books, the "Bell Atlantic" trucks and "Bell Atlantic" advertising in the District is more relevant to the Court's inquiry. The plaintiffs, however, have again failed to explain how, for instance, advertisement of telecommunication services to potential customers relates to the plaintiffs' alleged employment discrimination claims against BAC. The Court can see how such advertising may give rise to a claim against BAC by a customer or a competitor, but not to a claim of employment discrimination. See Bayles v. K–Mart Corp., 636 F.Supp. 852, 854 (D.D.C.1986) (Gasch, J.) (advertising in the District by a Virginia company was not a relevant jurisdictional fact where the company's alleged negligence was in no way related to that advertising); Omni Exploration, Inc. v. Graham Eng'g Corp., 562 F.Supp. 449, 454 (E.D.Pa.1983) (corporate advertising in the forum was irrelevant to personal jurisdiction issue where the plaintiff

failed to show how the advertising gave rise to the alleged injury suffered).

The plaintiffs also allege that BAC has "willingly reaped the profits" of this advertising. The Court has no idea what this vague and argumentative assertion means, and the plaintiffs make no effort to explain it. Thus, this bald assertion cannot support a finding of specific personal jurisdiction.

The identification cards purportedly carried by all employees of BAC subsidiaries and the BAC trucks they purportedly drive may bear a closer relation to the plaintiffs' discrimination claims against BAC, because they relate to the terms and conditions of their employment, i.e., the i.d. cards identify their employment status and the trucks are tools of their trade. However, the relationship appears to be extremely weak, especially on this inadequate record. To the Court's knowledge, the plaintiffs are not claiming that African–Americans have been denied i.d. cards or use of company trucks. In any event, the Court has no way of knowing if these "Bell Atlantic" trucks are even owned and operated by BAC. The plaintiffs asserts that this is the case, but the Court cannot speculate without any evidentiary basis whatsoever.

**b. Specific Jurisdiction Under § 13–423(a)(4).**

■ In order to invoke § 13–423(a)(4) of the D.C. long-arm statute, the plaintiffs must show that "an act or omission *outside* the District of Columbia" caused a tortious injury in the District of Columbia. D.C.CODE ANN. § 13–423(a)(4) (1995) (emphasis added).[15] However, the plaintiffs have alleged no specific facts showing where outside the District of Columbia, if anywhere, the alleged tortious act or omission allegedly took place leading to injury within the District. Rather, the plaintiffs allege only that "the unlawful employment practices and tortious acts complained of [in the complaint] were committed in the District of Columbia, *among other locations*." Complaint at ¶ 3 (emphasis added). The "among other locations" language

15. The plaintiffs also would have to show that BAC "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of

Columbia." D.C.CODE ANN. § 13–423(a)(4) (1995). A connection to the District under this section need not be related to the plaintiffs' claims of employment discrimination. *See Crane,* 814 F.2d at 763–64.

is far too vague and conclusory for the Court to invoke § 13–423(a)(4). Again, the Court will not speculate as to jurisdictional facts.

### c. Specific Jurisdiction Under § 13–423(a)(3).

 To invoke § 13–423(a)(3) of the long-arm statute, the plaintiffs must show that BAC either directly or through an agent caused tortious injury in the District of Columbia by an act or omission in the District of Columbia. The plaintiffs also must show that their claims are related to the acts form-. ing the basis for personal jurisdiction. *See El–Fadl,* 75 F.3d at 672.

Relevant to the analysis, the plaintiffs have drawn the Court's attention to (a) the Uniform Test Battery, a testing system purportedly designed and implemented by BAC and utilized for the hire, promotion, and transfer of all employees of BAC subsidiaries; (b) uniform equal employment opportunity policies which the subsidiaries may be required to follow; (c) a purported training center for all employees of BAC subsidiaries; and (d) a purported common legal department which managers at BAC subsidiaries contact whenever an employee is to be disciplined. Arguably, this alleged involvement by BAC in its subsidiaries' employment practices led to the injuries claimed by the plaintiffs, such as race discrimination in placement, training, and promotion. *See* Complaint at ¶ 1.

Even though the plaintiffs have proffered inadmissible evidence in claiming that BAC was directly involved in its subsidiaries' employment practices, it appears that there may be a colorable basis for the Court to assert jurisdiction over BAC under § 13–423(a)(3). Therefore, the Court will not determine whether the plaintiffs have made a *prima facie* showing of personal jurisdiction until they have had the benefit of formal discovery on this issue. *See El–Fadl,* 75 F.3d at 676.

### 4. The Plaintiffs Have Pled No Specific Facts Nor Proffered Any Evidence Showing That The Individual Defendants Are Subject To This Court's Jurisdiction, So They Must Be Dismissed From This Case, Without Prejudice.

 The complaint fails to plead any specific facts showing that this Court has personal jurisdiction over the individual defendants, and therefore, the individual defendants shall be dismissed from this lawsuit, without prejudice. While the plaintiffs have pled D.C. mailing addresses for two of the seven individual defendants, they make "no allegations regarding residences or principal places of business" of any of the defendants sufficient to show general jurisdiction over them under § 13–422 of the D.C.Code. *Dickson,* 831 F.Supp. at 897.

Nor have the plaintiffs alleged or even argued that the individual defendants are subject to the Court's long-arm jurisdiction under § 13–423 of the D.C.Code. While the complaint alleges that the individual defendants are "responsible" for the discrimination occurring in the District of Columbia, the complaint does not allege that the individuals actually committed any acts of discrimination inside the District of Columbia (or outside, for that matter). *See Naartex,* 722 F.2d at 787 (the plaintiff's sole allegation that ten individuals where "co-conspirators" was conclusory and did "not constitute the prima facie showing necessary to carry the burden of establishing personal jurisdiction"). Moreover, the plaintiffs' opposition is utterly silent with respect to the Court's alleged jurisdictional basis over the individuals.

 Finally, the Court notes that it does not have jurisdiction over individual officers and employees of BAC and its subsidiaries just because it may have jurisdiction over BAC. *See Keeton v. Hustler Magazine,* 465 U.S. 770, 781 n. 13, 104 S.Ct. 1473, 1482 n. 13, 79 L.Ed.2d 790 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him[.]"); *Calder v. Jones,* 465 U.S. 783, 790, 104 S.Ct. 1482, 1487–88, 79 L.Ed.2d 804 (1984) (holding that employee's contacts with the forum must be assessed individually); *Wiggins v. Equifax, Inc.,* 853 F.Supp. 500, 503 (D.D.C.1994) (Lamberth, J.) (same). Rather, "[p]ersonal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not

their acts and contacts carried out solely in a corporate capacity." *Id.*

■ Here, the complaint's allegations regarding the individual defendants state nothing more than their respective job titles at BAC and BAC subsidiaries, that they were high-level supervisors, and that they are "responsible" for alleged discrimination. *See* Complaint at ¶¶ 10–17. The plaintiffs have not alleged (nor argued) that the individual defendants did anything discriminatory outside of their official corporate capacities, nor have they alleged any contacts between the individual defendants and the District. Thus, the plaintiffs have pointed to no facts that would confer personal jurisdiction over the individuals sued in their individual capacity.

Accordingly, the individual defendants shall be dismissed from this case, without prejudice, because the plaintiffs have not alleged the "'threshold' jurisdiction sufficient to demonstrate the fairness of allowing the suit to continue" against the individuals. *Naartex Consulting Corp. v. Watt*, 542 F.Supp. 1196, 1199 (D.D.C.1982) (Flannery, J.) (quotation omitted), *aff'd*, 722 F.2d 779 (D.C.Cir.1983). *See also Trager v. Wallace Berrie & Co.*, 593 F.Supp. 223, 225 (D.D.C. 1984) (Harris, J.) (dismissing suit against individuals sued in their individual and official capacities where the plaintiff did not proffer any evidence of contacts the defendants had with the District). After limited discovery, the plaintiffs shall either dismiss their entire complaint against the individual defendants or amend their complaint to state sufficient jurisdictional facts.

## C. The Plaintiffs' Claims Against The Individuals Under Title VII Are Dismissed, With Prejudice, But The § 1981 Claims Shall Be Dismissed, Without Prejudice.

■ The defendants have moved to dismiss the plaintiffs' Title VII and § 1981 claims against the individual defendants for failure to state a claim upon which relief can be granted. In this Circuit, individuals cannot be held personally liable for discrimination under Title VII. *See Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.1995), *cert. de-*

*nied*, —— U.S. ——, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995). Thus, the Title VII claims against the individual defendants are dismissed, with prejudice.

In the employment context, 42 U.S.C. § 1981 protects the same right of employees "to make and enforce contracts ... as is enjoyed by white citizens ..." 42 U.S.C. § 1981(a) (1994). Under § 1981, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b).

■ Officers, directors and employees of a corporation "may become personally liable [under § 1981] when they intentionally cause an infringement of the rights secured by § 1981, regardless of whether the corporation may also be held liable." *Weaver v. Gross*, 605 F.Supp. 210, 212–13 (D.D.C.1985) (Hogan, J.); *accord Al–Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3rd Cir. 1986) (same). Specifically, the individuals must have been "personally involved in the discrimination" by having "directly participated" in the alleged discriminatory acts. *Al–Khazraji*, 784 F.2d at 518; *Weaver*, 605 F.Supp. at 213.

■ In the instant case, the plaintiffs have not alleged sufficient facts to state a claim against the individual defendants under § 1981. Merely alleging that the individual defendants were somehow "responsible for implementing and allowing discriminatory practices" does not suffice to meet the standard set forth above. Accordingly, the § 1981 claims against the individual defendants shall be dismissed, without prejudice. If, by the close of the limited discovery period, the plaintiffs still intend to pursue their § 1981 claims against the individual defendants, the amended complaint shall state with sufficient particularity how the individual defendants are liable under 42 U.S.C. § 1981. The Court notes that if, by the close of limited discovery, the plaintiffs cannot plead sufficient jurisdictional facts against the individual defendants, the § 1981 claims

against the individuals will dismissed regardless.

### D. The Plaintiffs' Claims for Intentional Infliction of Emotional Distress Are Not Subsumed by Their Title VII Claims, But Fail To State a Claim Upon Which Relief Can Be Granted.

### 1. Plaintiffs' Intentional Infliction Of Emotional Distress Claim Is Not Subsumed By Title VII, Because They Are Not Federal Employees.

In count four of the complaint, the plaintiffs allege that the defendants have "engaged in extreme and outrageous behavior toward the named plaintiffs and members of the class through repeatedly dehumanizing and degrading them and treating them as second-class citizens" and that the defendants "knew or should have known that their continuing pattern of discriminatory words and actions would cause Plaintiffs severe emotional distress." Complaint at ¶¶ 90–91. The defendants argue that, in cases of employment discrimination, "dismissal of an intentional infliction of emotional distress claim 'is warranted' because the conduct and the injury complained of *are subsumed by Title VII.*" Defendants' Memorandum in Support of Motion to Dismiss at 11 (quoting *Jackson v. American Chemical Soc.*, 812 F.Supp. 239, 243 (D.D.C.1993) (emphasis added by the defendants)).

There is a brief line of District Court cases in the District of Columbia that ostensibly supports the defendants' argument.[16] This authority stems principally from the decision of the Honorable Joyce Hens Green in *Stewart v. Thomas*, 538 F.Supp. 891 (D.D.C.1982). In *Stewart*, the plaintiff, a legal clerk in the litigation department of the Equal Employment Opportunity Commission, alleged that she had been subjected to verbal and physical sexual harassment and sex discrimination. *Id.* at 893. Specifically, she alleged that her

supervisor had made periodic sexual advances toward her, which included touching and caressing her body in a sexual manner, attempting to kiss her and verbally pressuring her for sexual relations. *Id.* She further alleged that her refusal to concede to his sexual demands caused him to retaliate against her in her pay status, work assignments, and her performance evaluation. *Id.* The plaintiff sued under Title VII and under common law theories of assault, battery, "outrage," and intentional infliction of emotional distress. *Id.*

The defendants moved to dismiss the intentional infliction claim on the ground that Title VII provided the exclusive remedy for all of the plaintiff's claims arising from the set of alleged facts. *Id.* at 894. The defendants relied on the Supreme Court's holding in *Brown v. General Services Administration*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). In *Brown*, the Supreme Court held that Title VII provided the "exclusive judicial remedy for claims of discrimination in *federal* employment," and, therefore, affirmed the dismissal of the plaintiff's claim under 42 U.S.C. § 1981. *Id.* at 835, 96 S.Ct. at 1969 (emphasis added).

Applying *Brown*, Judge Green held that "*Brown* does not prohibit federal employees who allege employment discrimination from suing on any cause of action arising from the same facts." *Stewart*, 538 F.Supp. at 896. To the extent the federal employee's "emotional injuries were the result of the stressful work situation created by the defendant, her claim of intentional infliction of emotional distress [was] dismissed as subsumed within Title VII but to the extent that her emotional injuries were a direct result of the defendant's assaultive behavior she [could] maintain her claim." *Id.* at 896–97. Judge Green held, therefore, that a *federal* employee (like the plaintiff before her) who has brought a Title VII claim is not precluded from suing for "a highly personal violation beyond the meaning of 'discrimination,'" such as an as-

---

16. *See Jackson v. American Chemical Society*, 812 F.Supp. 239, 243 (D.D.C.1993); *Weiss v. International Brotherhood of Electrical Workers*, 729 F.Supp. 144, 147 (D.D.C.1990); *Jones v. Sears Roebuck and Co.*, No. 87–2519, 1988 WL 43808, at *2 (D.D.C. Apr. 25, 1988); *Stewart v. Thomas*, 538 F.Supp. 891 (D.D.C.1982). Indeed, this Court referred to this line of authority in *Green v. American Broadcasting Companies, Inc.*, 647 F.Supp. 1359 (D.D.C.1986) (Richey, J.). *See Id.* at 1363.

sault. *Id.* at 896.[17] Judge Green's decision said nothing about *private* employees suing under Title VII.

The Supreme Court's decisions in *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) and in *Brown* demonstrate that the holding in *Stewart* cannot extend to private-sector employees suing under Title VII. In *Johnson,* the Supreme Court noted:

> Despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief. '(T)he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable *state* and federal statutes.'

*Johnson,* 421 U.S. at 459, 95 S.Ct. at 1719 (emphasis added; quoting *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974)).

Later, in *Brown,* where the Court held that Title VII was the exclusive remedy for employment discrimination suffered by federal employees, the Court stated:

> In *Johnson* the court held that in the context of Private employment Title VII did not pre-empt other remedies. But that decision is inapposite here ... [T]he holding in *Johnson* rested upon the explicit legislative history of the 1964 Act which " 'manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes.' " ... There is no such legislative history behind the [amendments to Title VII prohibiting discrimination in federal employment]. Indeed, ... the congressional understanding was precisely to the contrary.

*Brown,* 425 U.S. at 833–34, 96 S.Ct. at 1968 (quoting *Johnson,* 421 U.S. at 459, 95 S.Ct. at 1719). In short, the Supreme Court has recognized explicitly that Title VII is not the exclusive remedy for an employee who has suffered discrimination in private employment, and that Title VII does not subsume state law claims like intentional infliction of emotional distress which arise out of the same nucleus of operative fact.

The Court of Appeals of this Circuit appears to concur. In *Bouchet v. National Urban League, Inc.,* 730 F.2d 799 (D.C.Cir. 1984), the Court of Appeals held that it would have been erroneous for the District Judge to have stricken the plaintiff's demand for a jury trial and damages on her common law tort claims which accompanied her Title VII claim if the judge had concluded that the tort allegations were " 'subsumed' " within her Title VII claim. *Id.* at 804. Writing for the panel, then-Judge Scalia stated:

> It is clear ... that the " 'incidental' " nature of legal claims does not deprive them of their entitlement to separate relief and jury consideration, ... and that Title VII does not 'subsume' other claims based on the same set of facts[.]

*Id.* (citing *Ross v. Bernhard,* 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); 42 U.S.C. § 2000e–7; and *Johnson,* 421 U.S. at 461, 95 S.Ct. at 1720–21).[18]

 If the plaintiffs' intentional infliction of emotional distress claims are "subsumed," then, on the defendants' logic, so should their § 1981 claims. The defendants, of course, do not make this argument, and they cannot, because Title VII is not the exclusive remedy for private-sector employment discrimination. *Johnson,* 421 U.S. at 459, 95 S.Ct. at 1719–20. Thus, the plaintiffs common law tort claims will not be dismissed on this ground.

17. *See also Brock v. United States,* 64 F.3d 1421, 1423 (9th Cir.1995) (holding that if the type of the alleged harm to the federal employee is "highly personal," then Title VII is not the victim's exclusive remedy).

18. *Cf. Ray v. Reich,* No. 93–5294, 1994 WL 148105, at *1 (D.C.Cir. Apr. 13, 1994) (per curiam) ("[A]s Title VII provides the exclusive remedy for federal employees asserting discrimination claims, Ray's claims for intentional infliction of emotional distress and breach of the covenant of good faith and fair dealing were properly dismissed.") (citing *Brown,* 425 U.S. at 834–35, 96 S.Ct. at 1968–69).

## 2. The Plaintiffs Have Failed To State A Claim For Intentional Infliction Of Emotional Distress.

As an alternative ground for dismissal of count four, the defendants argue that the plaintiffs have failed to state a claim for intentional infliction of emotional distress. To state a claim, the plaintiffs must allege that the defendants engaged in "extreme and outrageous" conduct that "intentionally or recklessly" caused the plaintiffs "severe emotional distress." *King v. Kidd,* 640 A.2d 656, 667–68 (D.C.1993). Conduct that gives rise to liability for intentional infliction of emotional distress must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982).

While it is true that "[a]ctions that violate public policy, including discrimination, can constitute such extreme and outrageous conduct," [19] the discrimination allegations must be particularly egregious, such as a pattern or campaign of harassment, intimidation or abuse, to rise to the level of "extreme and outrageous conduct." *See Green,* 647 F.Supp. at 1362 (holding that "a pattern of harassment that violates public policy may, if serious enough," state a claim). This burden of pleading is not *de minimus.*

Thus, in *Harvey v. Strayer College, Inc.,* 911 F.Supp. 24, 27–28 (D.D.C.1996) (Attridge, Mag. J.), a college employee alleging pregnancy discrimination failed to state a claim where she claimed that her supervisor had told her shortly before her termination,

" 'I need to know if you're going to be able to handle the stress of the fall quarter registration; if not, I need to get you out of here and get someone else in,' well knowing that she was pregnant at the time and that her pregnancy two years earlier had resulted in the premature birth of her baby and her unexpected hospitalization because of complications associated with the birth of that child . .;" in *Anyaibe v. Gilbert Security Service, Inc.,* No. 94–2377, 1995 WL 322452, at *6 (D.D.C. May 18, 1995) (Hogan, J.), the plaintiff alleging national origin discrimination failed to state a claim even though he asserted that his supervisor frequently had made derogatory remarks about the plaintiff and his Nigerian heritage, that he had been forced out of his position and replaced by a person born in the United States, and that he had never received a promotion during his employment; in *Passer v. American Chemical Soc.,* 701 F.Supp. 1, 4 (D.D.C.1988) (Harris, J.), *aff'd in relevant part,* 935 F.2d 322 (D.C.Cir.1991), an age discrimination plaintiff failed to state a claim where he claimed that he had been forced to retire and that a symposium in his honor had been canceled for complaining about age discrimination; and in *Hoffman v. Hill and Knowlton, Inc.,* 777 F.Supp. 1003, 1005 (D.D.C.1991) (Harris, J.), the plaintiff alleging age discrimination failed to state a claim where he asserted that the employer had urged him to resign, given him an intern's desk among secretaries and other support personnel, refused to assign him any work, a secretary, a computer, or support services, which it did provide to younger, newly-hired employees, failed to promote him to positions for which he was qualified, and eventually terminated him for pretextual reasons.[20]

---

**19.** *Green v. American Broadcasting Companies,* 647 F.Supp. 1359, 1362 (D.D.C.1986) (citing *Howard University v. Best,* 484 A.2d 958, 986 (D.C.1984)).

**20.** *See also Underwood v. Archer Management Services, Inc.,* 857 F.Supp. 96, 99 (D.D.C.1994) (Richey, J.) (even though the plaintiff had stated a claim under D.C. law for her discharge because of her personal appearance, an allegation of discharge was insufficient to support a claim for intentional infliction of emotional distress) (citing *Keller v. Ass'n of Am. Medical Colleges,* 644 F.Supp. 459, 465 (D.D.C.1985), *aff'd,* 802 F.2d

1483 (D.C.Cir.1986)); *Roush v. KFC Nat'l Management Co.,* 10 F.3d 392, 401 (6th Cir.1993) (holding that, under Kentucky common law, the trial court should have granted j.n.o.v. for the employer on intentional infliction claim where testimony showed only that the plaintiff had been subjected to derogatory remarks about her age, she had to perform certain disfavored tasks more than other employees, she had to eat lunch by herself because her supervisor told other employees not to eat with her, she was not allowed to keep extra work supplies at her desk, forcing the arthritic plaintiff to walk to the supply room, and some of her personal belongings had been re-

By contrast, in *Estate of Underwood v. National Credit Union Administration,* 665 A.2d 621 (D.C.1995), the D.C. Court of Appeals held that the following evidence was sufficient to support a finding of intentional infliction of emotional distress: her supervisor repeatedly berated and yelled at her, at least once in front of the Board of Directors, threatened to do his own evaluation of her performance for the Board in order to " 'get her,' " threatened to tell lies about her because she had refused to sleep with him, threatened to tell the Board that it would have to choose between the two of them if she complained about him, and threw down a heavy box of documents at her feet, commanding her to carry it even though he was aware that she was physically unable to do so. *Id.* at 640 n. 31. The facts that the plaintiff had had a sexual relationship with her supervisor and that her supervisor had been aware of her fragile emotional and physical state showed that his behavior was "rooted in a campaign of [sexual] revenge." *Id.* at 641.

Also, in *Shephard v. Am. Broadcasting Companies, Inc.,* 862 F.Supp. 486 (D.D.C. 1994) (Lamberth, J.), *vacated on other grounds,* 62 F.3d 1469 (D.C.Cir.1995), the following allegations stated a claim for intentional infliction of emotional distress: unlike less senior non-black males, the plaintiff's supervisor had given her inadequate and inferior workspace, diverted prestigious and important projects away from females, treated her more coldly and rudely than non-black males, gave her written warnings for poor performance when non-black males who performed poorly never received such warnings, accused her in public of failing to work her hours and gave others credit for her work, refused her overtime compensation that he gave to non-black males, tore up and burned her work and wrote childish, sarcastic and derogatory comments on it, and forced her to take humiliating remedial training. *Id.* at 495.[21]

■ While the plaintiffs herein generally have alleged discrimination in the areas of training, work assignments, discipline, promotion, and termination and in the form of harassment, the above-cited cases show that such allegations—especially when they are conclusory and utterly devoid of detail as are most of the allegations set forth in the complaint—do not state a claim for intentional infliction of emotional distress. At page 38 of their opposition, the plaintiffs point the Court's attention to the few detailed allegations in the complaint that they claim, taken as a whole, purportedly state a claim for intentional infliction of emotional distress. The plaintiffs are mistaken.

The plaintiffs cannot state a claim of intentional infliction of emotional distress by aggregating the allegations of the forty-eight named plaintiffs and arguing that each named plaintiff (and presumably every putative class member) experienced each and every one of the incidents alleged in the complaint. Because the tort of intentional infliction of emotional distress is premised on the alleged harm caused to an individual, the allegations of each individual plaintiff must be sufficient in themselves to state a claim. The plaintiffs are not excused of their burden of pleading sufficient facts merely because they have styled their complaint as a class action. Thus, for example, the allegation that plaintiff Eric Burden was told that "98% to 99% of black test-takers who take tests for management positions fail them" cannot be combined with plaintiff Reginald Clark's allegation that he "has been the subject of racially discriminatory remarks." *See* Complaint at ¶¶ 23 and 27. Rather, their allegations, like the rest of the

---

moved from her desk and placed in storage during a sick leave), *cert. denied,* —— U.S. ——, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994).

**21.** *See also Green,* 647 F.Supp. at 1361 (the plaintiff alleged an egregious pattern of discrimination sufficient to state a claim for intentional infliction of emotional distress, because "defendants encouraged insubordination by the plaintiff's supervisees, assigned plaintiff an 'oppressive work schedule,' were routinely rude, cold, and disdainful to plaintiff, issued a written performance evaluation that falsely attacked plaintiff's job performance, subjected plaintiff to job-related restrictions that non-female, non-minority co-workers did not experience, ... created a 'hostile and intimidating work environment' poisoned with discrimination," and fired her in retaliation for filing a discrimination claim against the defendants).

plaintiffs' allegations, must stand or fall on their own.

The Court finds that the plaintiffs' respective allegations fail to state a claim of intentional infliction of emotional distress. Viewed most favorably for the plaintiffs, the complaint, at best, alleges that each named plaintiff was either denied a promotion, training, work assignment or other term or condition of employment or was harassed based on their race.[22] Sprinkled amongst these allegations is the occasional, isolated allegation like: Eric Burden "was told that 98% to 99% of black test-takers who take tests for management positions fail them" (Complaint at ¶ 23); James Carrington "has observed that blacks tend to be assigned more of the hard physical work, while whites do more of the technical work" (Complaint at ¶ 26); Reginald Clark "has been the subject of racially discriminatory remarks, including, on two occasions, suggestions that he had held up area convenience stores" (Complaint at ¶ 27); Raymond Flowers, Venida Medlock "and other blacks have been sent to [high-crime] areas alone", even though Bell Atlantic has designated these areas as being " 'two-man' " areas (Complaint at ¶¶ 32 and 45); Clemantis Fortson was denied training allegedly because she was not " 'well-liked' " (Complaint at ¶ 33); Michael Gillis allegedly has been asked to sweep the floor, but whites are not (Complaint at ¶ 34); Kelvin Gunn was asked to perform a task that required him to stand even though he, at some unspecified point in time, had broken his ankle (Complaint at ¶ 36); Elvin Jackson has been "unfairly evaluated and criticized" (Complaint at ¶ 41); Kevin Logan has "observed that black persons have been required to submit to urine drug testing after a motor vehicle accident, whereas white persons were not" (Complaint at ¶ 43); and Bell Atlantic "unfairly suspended" Myra Williams medical benefits (Complaint at ¶ 61).

It is clear, therefore, that no single plaintiff has alleged a pattern of harassment, intimidation or abuse against him or her individually. As noted above, the mere allegation that a plaintiff was denied a promotion, training or other term or condition of employment or that a plaintiff was terminated on discriminatory grounds does not, without substantially more than the plaintiffs' have alleged, state a claim for intentional infliction of emotional distress. Accordingly, the plaintiffs' fourth count for intentional infliction of emotional distress is dismissed, with prejudice.

## IV.

## CONCLUSION

For the foregoing reasons, the Court shall GRANT, with prejudice, the defendants' motion to dismiss the plaintiffs' claims under Title VII and for intentional infliction of emotional distress against the individual defendants, shall GRANT, without prejudice, the defendants' motion to dismiss the plaintiffs' claims against the individual defendants under 42 U.S.C. § 1981, shall GRANT, without prejudice, the defendants' motion to dismiss the individual defendants for lack of personal jurisdiction, shall GRANT, with prejudice, the defendants' motion to dismiss the plaintiffs' claims for intentional infliction of emotional distress against defendant BAC, shall DENY, without prejudice, the defendants' motion to dismiss the plaintiffs' claims under Title VII and 42 U.S.C. § 1981 against BAC, and shall DENY, without prejudice, the defendants' motion to dismiss BAC for lack of personal jurisdiction. Further, the plaintiffs shall have sixty days to conduct discovery limited to the following three issues: (1) BAC's status as an "employer" under Title VII and 42 U.S.C. § 1981; (2) whether BAC is subject to personal jurisdiction in this Court; and (3) whether the individual defendants are subject to personal jurisdiction in this Court.

If, by the end of the sixty-day period, the plaintiffs have not dismissed their entire complaint, with prejudice, they shall file an amended complaint to correct the deficiencies in their complaint. If the plaintiffs timely file an amended complaint, the defendants

---

**22.** It is questionable whether many of these plaintiffs even state claims under Title VII and 42 U.S.C. § 1981, given their conclusory allegations. However, this issue is not before the Court.